| 5  | 273 |
|----|-----|
| 28 | 392 |
| 5  | 273 |
| 31 | 636 |

## P. B. MARSHALL *v.* THE STATE.

1. MURDER BY POISON — INDICTMENT. — See an indictment for murder by
   poison held sufficient.

2. EVIDENCE, though not bearing *directly* on the issue, nor sufficient *per se* to
   support a conviction, is admissible if it *tends* to prove the issue or con-
   stitute a link in the proof of it.

3. SAME — PRACTICE. — The relevancy of evidence to the issue need not be
   intrinsically apparent when it is offered. If the counsel undertakes to
   connect it with the issue by other evidence, the practice is to admit it, and
   afterwards, if not so connected, to withdraw it from the jury. But, espe-
   cially in capital cases, prosecuting counsel should never so tender collateral
   evidence calculated to prejudice the accused, unless morally certain of his

ability to make good his undertaking to show its relevancy. The law as much enjoins the protection of the innocent as the conviction of the guilty.

4. CONFESSIONS. — When a confession of the main fact in issue would not be admissible, evidence of a confession of collateral facts tending to establish the main fact should not be admitted.

5. SAME — CASE STATED. — In a trial for murder, the State was allowed, over the defendant's objection, to prove that the defendant, after his arrest and while in custody, sent word to a witness to leave the country, promising to furnish him money for the purpose. No warning was given the defendant that his statement might be used against him. *Held*, that the evidence was not competent under the provisions of the Code, and its admission was error.

6. IMPEACHMENT OF WITNESSES. — In impeaching the credit of a witness, it is proper to inquire as to his general reputation for truth in the neighborhood of his residence, and whether that reputation is such as entitles him to belief; but not to ask the impeaching witness whether, from such reputation, he would believe the impugned witness.

7. SAME. — The inquiry must be limited to the general reputation of the impugned witness in the community of his residence, or where he is best known; and the impeaching witness must speak from the general reputation, and not from his own individual opinion.

8. BILL OF EXCEPTIONS — PRACTICE IN THIS COURT. — When matters of fact are involved in the rulings of the court below, such rulings will not be revised by this court unless the facts are substantiated by proper bills of exception. Statements in a motion for a new trial or an assignment of errors do not suffice.

APPEAL from the District Court of Young. Tried below before the Hon. J. R. FLEMING.

The appellant was charged, by indictment, with the murder, by poison, of Dora Dees, on April 3, 1878, in Young County, Texas. A condensed statement of the leading evidence is here appended. The verdict was murder in the first degree, and the judgment death by hanging. The State's witness Shockley had been arrested as a *particeps criminis*, but turned State's evidence.

The charging part of the indictment is as follows:

"That, heretofore, on, to wit, the 3d day of April, A. D. 1878, in the county of Young, and State of Texas, P. B.

Marshall, not having the fear of God before his eyes, but being moved and seduced by the instigation of the devil, and of his malice aforethought, contriving and intending one Dora Dees to deprive of her life, and her feloniously to kill and murder, on the said 3d day of April, A. D. 1878, and on divers other days before and after the said 3d day of April, and before the finding of this bill, with force and arms did knowingly, unlawfully, wilfully, feloniously, and of his malice aforethought, mix and mingle certain deadly poison, to wit, strychnine, in certain flour which had been at divers days and times, during the time aforesaid, prepared for the use of the said Dora Dees; and was afterward, to wit, on the said 3d day of April, made into bread for the use of the said Dora Dees, to be eat by her, the said Dora Dees, he, the said P. B. Marshall, then and there well knowing that the said flour, afterwards made into the said bread, with which he, the said P. B. Márshall, did so mix and mingle the said deadly poison as aforesaid, was then and there prepared for the use of the said Dora Dees, with intent to be then and there administered to her for her eating the same; and the said bread, so made from the said flour, with which the said poison was so mixed, as aforesaid, afterward, to wit, on the said 3d day of April, 1878, and on the said other days and times, in the said county of Young, was delivered to the said Dora Dees, to be then and there eat by her; and the said Dora Dees, not knowing the said poison to have been mixed with her said bread, made of the said flour, did afterwards, to wit, on the said 3d day of April, and on the said divers other days and times, then and there eat and swallow down into her body several quantities of the said poison so mixed, as aforesaid, with the said flour; and the said Dora Dees, of the poison aforesaid, and by the operation thereof, became sick and greatly distempered in her body; of which said sickness and distemper of body, occasioned by the said eating, taking, and swallow-

ing down into the body of the said Dora Dees of the poison aforesaid, so mixed and mingled in the said flour, as aforesaid, she, the said Dora Dees, from the said several days and times on which she had so taken, eaten, and swallowed down the same, as aforesaid, did languish, and, languishing, did live until the 4th day of April, 1878 ; on which said 4th day of April, 1878, in the said county of Young, she, the said Dora Dees, of the poison aforesaid, so taken, eaten, and swallowed down as aforesaid, and of the sickness and distemper thereby occasioned, did die; and so the grand jurors aforesaid, upon their oaths aforesaid, do say and present that the said P. B. Marshall, in the State and county aforesaid, and on the day and year aforesaid, and by the manner and means aforesaid, unlawfully, knowingly, and feloniously, and of his malice aforethought, her, the said Dora Dees, did kill and murder, contrary to the law, and against the peace and dignity of the State.''

A. N. Dees testified, for the State, that he was the father of deceased, and had been for some time on bad terms with the defendant.   On the evening of April 2, 1878, witness, with his wife, attended a party at a neighbor's, some two miles from their home, leaving their little daughter, the deceased, some seventeen months old, in charge of one Howard, who lived with them.   They returned early next morning, and found their dog, which they left tied near the door, dead, where he was tied.   Witness, his wife, and the deceased ate breakfast, after which witness dragged his dog off, and cut him open, finding in his stomach two pieces of bacon, between which was found a piece of strychnine. Witness laid the meat on the plate of the house, and went down into the field, where he found defendant and one Shockley at work.   Here he accused defendant of poisoning his dog, which the defendant denied, expressing the suspicion that one Moore had done the poisoning, alleging that Moore had threatened witness in his (defendant's) hearing,

some days before.    Witness, on his return, found his child sick and in convulsions.    Sent for Mrs. Marshall and the doctor, the latter arriving at nine o'clock.    The child died on the same day, April 3, 1878, between twelve and one o'clock, A. M.    The child was in good health the evening before, and ate a hearty breakfast of biscuit and gravy.    The biscuits were made of flour from a sack that had been some days in use, and were made that morning.    Saw the child buried, some twenty-four hours after death, and was present when it was exhumed and a *post-mortem* examination had.

·As soon as witness became convinced his child was poisoned, he gathered up the biscuits left, and put them in a boiler behind the stove, and, after the child's death, had them analyzed by a chemist, the analysis disclosing the presence of strychnine.    Defendant and witness cultivate land in the same enclosure, the witness's land being farther removed from his house than that of defendant, which lay between his (witness's) house and land.    The approach to the witness's house from where he worked — and was at work on the evening of the 2d, until he returned to go to the party — was obscured from sight by intervening obstructions.    There was no one at the house of witness on the evening or day of the 2d, the child having been left with its aunt, Miss Jones, at Mrs. Marshall's.

The witness and his wife, having no appetite, ate but a meagre breakfast on the 3d, yet witness felt much troubled with pains in his bowels and bones; had experienced no such sensations before.    The sack of flour from which the biscuit were made for breakfast was used no more, but another opened before another cooking.    Witness investigated the charge that Moore had done the poisoning of the dog, but found that Moore had gone to Weatherford two weeks before, and had not been back in the neighborhood, and had not seen defendant.    Discovered that Dr. Stroop,

in Graham, had sold some strychnine near the time the child died. Witness further testified that he and Moore were friends. He and defendant were not friends. On cross-examination, he says that defendant and Shockley worked some 600 yards nearer witness's house than witness and his wife did, and that witness's house could not be seen from where he (witness) and his wife worked. Had not said to Mrs. Marshall that he was fearful the child had got hold of some of the poisoned meat; knows that it did not, for he first put the meat on the house-plate, and then burned it. The child ate no meat that morning. His house had a main and shed room, the door to the latter having no shutter, — only a wagon-sheet.

Elbert Jones, for the State, testified that he is the father of Mrs. Dees, the mother of deceased, and was staying at Dees's house at and about the time of the alleged poisoning. On the morning of April 3, 1878, going from Humphries's house to Marshall's, with his two daughters, he heard of the sickness of Dees's child. He immediately went to Dees's and found the child in spasms. After being there some time, he took his position near by to watch the child, having first poured out some coffee from a pot standing on a table in the shed-room. While drinking this, he inadvertently took up a fragment of a biscuit lying near, and commenced eating it. He found it so strangely and unusually bitter that the presence of strychnine was impressed upon his mind. He immediately spit it out, apprehensive, though not sure, that it contained strychnine; and went presently into the woods on private purposes, and there discovered the disembowelled body of Dees's dog. Did not know of the death of the dog before he found the body in the woods. Convinced that both the dog and child had been poisoned, he returned to the house to announce his belief, but found the child sinking so fast he said nothing of it until after the

child's death. He then told the doctor of his apprehensions, and the doctor immediately said that the child had unquestionably died from poisoning by strychnine.

Witness and Dees examined the meat taken from the dog's stomach, which they found on the house-plate, and discovered in it a piece of crystal strychnine. The meat was immediately burned. Witness went with Dees into the smoke-house, and saw the sack of flour, of 100-pound size, half used, from which the biscuit were said to have been made, and assisted Dees in bringing into the house one of six unused sacks of flour, from which subsequent meals were cooked. Upon consultation with Dees, witness went to Graham, and discovered that Dr. Stroop, on or about April 1st, had sold some strychnine to a man unknown. Saw Dees and his wife gather up the biscuit left over from breakfast, and deposit them in a boiler behind the stove, and know they were the same of which a number were analyzed by Dr. Stroop.

On cross-examination: Knows the taste of strychnine, having taken and administered it under direction of physicians. Dinner, on April 3d, at Dees's, was at a later hour than usual; was cooked by one of his daughters and Miss Mollie Marshall. Saw the defendant at work that day, and saw him go to his (defendant's) house during the day, but does not know what for. Saw Dees and his wife at work that evening. Dees and his wife worked from 700 to 1,000 yards from their house, and defendant was at work between them and said house, and from 300 to 500 yards nearer the house than they worked.

Dr. L. J. Stroop, for the State, swears that he is a druggist in Graham, Young County; that he sold Shockley ten grains of crystal strychnine, for 10 cents, directing him, as it was a small parcel, to place it in his pocket-book, which he (Shockley) did, in witness's presence; that a few days afterwards Mr. Dees and the district attorney of Young

County brought him some biscuit, which, after applying the sulphuric acid test, he found to contain crystal strychnine. Witness described the process through which he carried the analysis, and rested on the authority of medical books. Knows the man was Shockley, for the party purchasing so told him.

Samuel Howard, for the State, swears to the same material facts that Dees swears to. Says he was at work with Mr. and Mrs. Dees on the evening of April 2d. That they worked about 700 or 1,000 yards from the house, and 300 to 500 yards beyond where defendant and Shockley were at work. Could not see Dees's house from where they worked, nor any person about it. Took charge of deceased during the night of the 2d, when Dees and wife were absent. Witness ate cold victuals for supper; and next morning dressed the child, shortly before its parents came home. It was then in good health. Found the dog dead when he got up on April 3d, though it was alive and barking when he went to bed. Was not further from the house than ten steps during the absence of Mr. and Mrs. Dees. Mrs. Dees cooked breakfast next morning, and witness ate three biscuits, which tasted strangely bitter. Felt pains in his stomach through the day, and made several efforts to vomit. Knows of no hard feelings between defendant and Dees, except what he learned from the latter. Had, with Dees, taken seed-corn from defendant's crib during defendant's absence.

J. T. Bowen testified, for the State, that he lived with defendant, and knew W. P. Shockley, who also lived there. That, about April 1st, Shockley was sent by defendant to Graham for some things, but what they were defendant does not know. Shockley returned next day; and, while witness was unharnessing horses near the door of defendant's house, he saw Shockley pull out his pocket-book, and say to defendant, "Here, take this; I have had it long

enough," — the two stepping to the corner of the house. Witness saw Shockley give something to defendant, and saw defendant take it, but does not know what it was; recognizes the pocket-book exhibited as very like the one he saw Shockley take from his pocket, and from it hand something to defendant.

On cross-examination: Knows that defendant had a sore hand at that time, but not so sore as to stop his work; never heard defendant make threats against Dees; knows that their families visit.

Miss Sophronia Jones testifies that, on the day before Dora Dees died, she got in the wagon with Shockley, on his return from Graham, and rode with him from Brown's to the river, where he stalled; and from there she walked with him up to the house of defendant, and when they got there saw Shockley give defendant something, but does not know what it was.

The witness Benge knew that the body exhumed for a *post-mortem* examination was that of Dora Dees, whom he knew and buried.

Dr. Davidson testified that the deceased, judging by the symptoms, died from the effects of strychnine. If witness ever told Mrs. Marshall that it had worms, it was told to quiet those around while he made an examination; said then, and says now, it died from the effects of strychnine.

Drs. Dyus and Stover, for the State, testify that, in the *post-mortem*, they found strychnine in the stomach of the child in quantities sufficient to kill, describing their test, etc.

W. B. Lawrence swears that defendant, on the day of his examining trial, came to his house, under guard, and asked him to see Shockley and ask him to leave the country, for which he (defendant) would furnish him the money.

W. P. Shockley, testifying for the State, says that he lived with defendant in April, 1878. On the first day of

that month, by direction of defendant, he went to Graham to make purchases and transact business for defendant, taking Miss Jones with him as far as Capt. Brown's, near to which point defendant accompanied them on horseback. After passing Brown's, where he left Miss Jones, he was overtaken by defendant, who directed him to purchase, among other things, 25 cents' worth of strychnine. Witness, after purchasing other things ordered, had but 10 cents left, with which he purchased strychnine from Dr. Stroop, putting it in his pocket-book, as directed by the druggist. On his return, next day, he took Miss Jones up at Brown's, and drove with her to the river, where his horses stalled. After going up to the house and delivering the other purchases to Mrs. Marshall, he took out his pocket-book and gave the strychnine to defendant, saying, "I have had this long enough." They then went to the field to work. The witness described the locality of the defendant's and Dees's fields as described by other witnesses, and saw Mr. and Mrs. Dees and Howard at work, some 500 yards off. Twice during the evening witness and defendant went up to defendant's house. On the last trip to the house, defendant cut from a side of bacon, or hog-meat, a piece about three inches long and two inches wide, saying to his wife that he intended using it to grease a plow. After reaching the field, he sliced this meat twice, from one end to within an inch of the other. In these splits he put some of the strychnine, after which he wrapped the rest up and put it in the lining of his hat. Defendant said, "Now, I'm going to kill that d—d dog that has been tearing my pigs." He went off down the "swag," and I watched him until he went around Dees's house. From his (defendant's) house, or from where Dees, his wife, and Howard were at work, this approach could not be seen; but from where witness was, the defendant could be seen all the way. Witness next saw defendant standing

in the shed-room door of Dees's house. When he (defendant) came back, he asked witness if there was enough of the strychnine given to kill the dog. Witness answered that it was, if given; and defendant said he had given it, and had offered the dog water from a pan, but the dog would not drink. The witness then asked what defendant had done with the balance of the poison, and he said he had placed it in a crack of the house. Witness suggested that this disposition of it was dangerous, as some one might get hold of it. Defendant said he had put it where he couldn't find it himself. After the death of the child, witness and defendant again spoke of the poison, when defendant said things were getting so hot he had burned it.

Witness afterwards told defendant that Dees was asking all over the country for Moore, when defendant said Dees was a d—d fool to be hunting Moore for the man who committed the crime. Witness then told defendant that Moore had threatened to kill Dees; and defendant said that if Moore wanted any help, he (defendant) would let him have a shot-gun that would throw shot a hundred yards. Defendant said that Dees was trying to undermine him (defendant); that he (Dees) had been to Palo Pinto to see Sam Haynes, in an effort to purchase his (defendant's) land. After witness was arrested, he was carried to the sheriff's office, where defendant and his attorney, Glasgow, were, both of whom told witness that he (witness) could swear anything he pleased so he said nothing about giving defendant the strychnine. This was before witness testified at the examining trial.

On cross-examination, witness said that he saw defendant at the east door of Dees's shed-room, and supposes, as he left there, he went through the main room and out at the south door. Witness does not know his relation to Miss Mollie Marshall, defendant's daughter, at this time, but was engaged to be married to her when this poisoning happened.

Defendant never told witness that "this thing had to be stopped," and never opposed his engagement to his daughter Mollie. Was present in the field when Dees accused defendant of poisoning his dog, and defendant denied it. Witness told Dees he had seen Moore in Waco Bend a few days before, in order to keep down a fuss, defendant having told Dees he (defendant) suspected Moore of poisoning the dog. Witness had not seen or heard of Moore for three weeks.

Mrs. Lou R. Marshall, for the defence, testifies that she is the wife of defendant, and remembers the day the child died. Being sent for, she went up to Dees's and found it very sick. The doctor came shortly afterwards, and pronounced its ailment to be worms, and so treated it. Witness does not remember seeing any one eat at Dees's, but ate a biscuit herself that was cooked that morning, from the effects of which she felt badly. Witness asked Dees what he supposed was the matter with the child. He said he feared that it was poisoned; that his dog had been poisoned the night before, and he was afraid the child had got hold of some of the poisoned meat he had taken from the stomach of the dog and placed on a stump or box. Witness, her husband, and the Dees family were friendly, and Mrs. Dees's sisters had been staying at her house. Mr. Dees told witness that his dog must have been poisoned about eleven o'clock the night before, as he was still warm when cut open. Defendant and witness sleep together, and witness knows the defendant was not out of bed during the whole of the night in question. There was no particular intimacy between defendant and Shockley.

Miss Marshall, sworn, says that she is the daughter of defendant. Was at Mr. Dees's the day his child died, and assisted in the cooking. Mr. Shockley had addressed witness, and they were engaged. Witness's father, the defendant, had said nothing to her about the engagement, but did not approve of it.

Cross-examined, she says that defendant knew nothing of the engagement. Witness and her mother ate one of the biscuits cooked in the morning, getting them out of the boiler behind the stove.

J. T. Walters, for the defence, testifies that defendant told him he was going to raise h — l about his daughter's engagement with Shockley.

Capt. Brown, E. Robinson, E. G. Massey, and J. T. Walters all swear they knew the general reputation of Shockley for truth and veracity in his neighborhood, which reputation was bad. All of these witnesses but Brown had known Shockley only since the previous November. Brown had known him in three counties, with the same reputation; and further, that Shockley came to this country in his (Brown's) employ. Brown said he "was friendly with Shockley, and has employed counsel to prosecute him in this case."

In rebuttal, the State proved by Capt. Moseley, Mr. Benge, his son, and Mr. Humphries, that Shockley has been in the country only since November, not long enough, in the estimation of witnesses, to make a reputation. Some of these witnesses, a short time before, had seen Shockley at a party at Capt. Brown's, as the escort of Miss Marshall, and taking a leading part in the party.

No brief for the appellant.

*George McCormick*, Assistant Attorney-General, for the State. As to the second error assigned, the court will see, from an inspection of the facts set out in the bill of exceptions, that the court did not err.

The prisoner had sworn to an application for a continuance, stating that he desired the testimony of a witness; that such testimony was material to his defence; that due diligence had been used to secure the witness's attendance, and that he was not absent by affiant's consent or procure-

ment, etc. Notwithstanding this oath, a letter had been written by the prisoner's leading counsel requesting the witness to evade the process of the law, that thereby the prisoner's cause might be continued.

The district attorney, having a knowledge of the fact that the witness had been purposely kept away from the court, attempted to show that it was done with the knowledge and consent of the prisoner; and with the understanding on the part of the court that the prisoner would be connected with the act of his attorney, the court permitted evidence of the acts of the attorney to go to the jury; but when the State's counsel failed to connect the prisoner with the facts, the jury were directed to disregard the evidence, and it was withdrawn from their consideration.

It was within the province of the court to withdraw the testimony from the jury. *Sutton* v. *The State*, 2 Texas Ct. App. 342. And having been withdrawn from the consideration of the jury, no matter for what reasons, it cannot now be urged here that such evidence was erroneously admitted.

The court did not err in excluding evidence tending to show a feud and ill-feeling between the father of the murdered child and one Moore. Such evidence was immaterial, and not in accordance with the rule requiring the evidence to be confined to the point at issue, or tending in any way to elucidate the matter before the court.

In the case at bar the serious question arises, viz. : If the poison was placed in the sack of flour with the intent to kill any other person than the deceased, would the fact that deceased was killed thereby, of itself, without further proof of express malice, render the defendant guilty of murder in the first degree?

The statute (Pasc. Dig., arts. 2198–2200) provides that if any person shall mingle poison with any drink, food, or medicine, with intent to kill or injure any other person, and by reason thereof the death of a person be caused, the

offender shall be deemed guilty of murder. Now, as to whether this offence would be murder in the first or second degree is settled by the statute, which declares that all murder committed by poison shall be murder in the first degree.     Pasc. Dig., art. 2267.

The Supreme Court, in *McCoy* v. *The State*, 25 Texas 33, and in the case of *Ferrell* v. *The State*, 43 Texas 503, seems to have held that the malice required to raise a killing from murder in the second degree to murder in the first must be directed against the party killed. But this doctrine, whether correct or false, cannot apply to a killing by poison. The statute declares that to administer poison with intent to injure, and which results in death, is murder in the first degree ; or, at least, a proper construction of the provisions of the Code leads to this conclusion.

If, then, this be the law of this State, the court did not err in failing to charge the jury the law applicable to the offence of murder in the second degree. But, again, it would seem that the facts in the case at bar did not authorize a charge on murder in the second degree. If the poison was laid in the flour, the food of the family, the design must have been to kill the whole family ; the prisoner, at the time he placed the poison there, must, from the very nature of the act, have been actuated by malice towards all whom he expected to take his deadly poison ; and the fact that only one of the family (the child) was killed does not reduce the offence to a lower grade than it would have been had he killed the whole family.     The prisoner, by placing the poison in the food of the family, although it might not affirmatively appear that he intended especially to kill the child, or that he had such malice against the child, was guilty of and evinced such specific malevolence, such utter disregard of human life, such express malice against all of the family, whom he supposed would take the poison, as to show murder in the first degree.

The only other question that it is deemed necessary to refer to arises upon the bill of exceptions taken to the admission of the statement of the prisoner, made while under arrest.

I submit that the statements made by the prisoner to the witness Lawrence cannot be considered *confessions*, as that term is used in our statute forbidding the introduction of such testimony. It is true that this court, in *Haynie* v. *The State*, 2 Texas Ct. App. 174, held, in substance, that there is no difference in the rule admitting such testimony when the confession is direct and positive and when it is only collateral, and tends to establish a matter connected with the *corpus delicti*.

In the case at bar, the prisoner told his friend to go and tell his co-defendant to leave the country, and that he would furnish him with the money to leave on. This simply shows that for some reason the prisoner was anxious that his co-defendant, who afterwards turned State's evidence, should absent himself, avoid arrest, and keep out of the way of the officers of the law. It is true that unfavorable inferences may be drawn from such a message having been sent, but certainly it cannot truthfully be said that such a message was an admission or confession of guilt. For a full discussion of this question see *Speer* v. *The State*, 4 Texas Ct. App. 474, and authorities cited.

WHITE, J. P. B. Marshall, this appellant, was indicted for the murder of one Dora Dees. The murder is alleged to have been committed by mixing and mingling strychnine, a deadly poison, with flour, which was afterwards made into bread, and which was thus eaten by the said Dora Dees, from the effects of which she died on April 4, 1878.

The statute under which the indictment was brought reads as follows:

"If any person shall mingle any poison, or any other

noxious potion or substance, with any drink, food, or medicine, with intent to kill or injure any other person, or shall wilfully poison any spring, well, cistern, or reservoir of water with such intent, he shall be punished by imprisonment in the penitentiary not less than two nor more than ten years." Pasc. Dig., art. 2198.

" If any person shall, with intent to injure, cause another person to inhale or swallow any substance injurious to health or any of the functions of the body, or if such substance was administered with intent to kill, he shall be punished by confinement in the penitentiary not less than two nor more than five years." Pasc. Dig., art. 2199.

" If, by reason of the commission of the offences named in the two preceding articles, the death of a person be caused within one year, the offender shall be guilty of murder, and punished accordingly." Pasc. Dig., art. 2200.

" All murder committed by poison    *    *    *    is murder in the first degree." Pasc. Dig., art. 2267 ; *Tooney* v. *The State*, decided at the present term of this court, *ante*, p. 163.

A motion was made to quash the indictment, which was, as we think, properly overruled ; the allegations being, in our opinion, sufficient to charge the offence. Defendant's motion for a continuance being then heard and overruled, was immediately followed by a trial of the case, which resulted in the conviction of defendant, the punishment incident thereto and assessed being death by hanging.

The record of the proceedings, as presented here, is quite voluminous, and contains many interesting questions, which we do not propose to discuss, because not essential to a disposition of the case, and not likely to arise on a subsequent trial. We have given the case all the consideration which the importance to the defendant of the issues involved claimed at our hands, and in doing so have, if possible, experienced a greater degree of responsibility than usual

even in such cases, owing to the fact that the conviction, in so far as it does not rest upon the testimony of a *particeps criminis*, is based on evidence entirely circumstantial, and the further fact that appellant has not been represented on his appeal, by brief or otherwise.

Six bills of exceptions were saved by defendant during the trial, three of which only it is proposed to notice, to wit, the third, fifth, and sixth.

The third bill is, that the court " permitted the district attorney to introduce testimony showing that the defendant's leading counsel, J. H. Glasgow, Esq., had written to Emmett Marshall, a witness in said cause, to leave his place of business and remain away, so as to avoid the service of the process of the court, and to stay away until the said cause was continued, the district attorney stating to the court that he would be able to connect the defendant with the said conduct of his counsel ; and the court, being of the opinion that the district attorney had not sufficiently connected the defendant with the said conduct of his counsel, excluded all of said testimony from the jury, then and there instructing the jury to disregard the same," etc.

As laid down by Mr. Greenleaf, the rule is that " it is not necessary, however, that the evidence should bear *directly* upon the issue. It is admissible if it *tends* to prove the issue, or constitutes a link in the chain of proof, although it might not justify a verdict in accordance with it. Nor is it necessary that its relevancy should appear at the time when it is offered, it being the usual course to receive at any proper and convenient stage of the trial, in the discretion of the judge, any evidence which the counsel shows will be rendered material by other evidence which he undertakes to produce. If it is not subsequently thus connected with the issue, it is to be laid out of the case." 1 Greenl. on Ev., sec. 51 *a.* This is the rule in civil cases, and ordinarily the rules are the same in civil and criminal cases

In the case at bar, the learned judge did all that he had power to do at the time, by instructing the jury to disregard the evidence, when he became satisfied that the district attorney had failed to connect defendant with the illegal acts of his attorney. Still it must be apparent that such testimony having once gone to the jury, its impression would necessarily, to some extent, remain in their minds, though they were ordered to discard it; and in a case of circumstantial evidence it is next to impossible to say how far that impression exercised its influence in supplying any defect which might have arisen, or in solving any doubt in their minds on the general state of the evidence. A prosecuting officer in behalf of the State, in his zeal for a conviction, should never overlook the fact that the interests of society and the vindication of the law require at his hands as much the protection of the innocent as the conviction of the guilty. Evidence of this character, in cases involving life, should never be proposed by him unless he is morally certain that he can make good his promise of connecting the defendant with the matter; there should be no room for doubt where, as in this case, he could have ascertained in advance the existence or non-existence of defendant's connection with the proposed evidence.

Bill of exceptions No. 5 was an objection to the entire testimony of the State's witness W. B. Lawrence, which was as follows: "I know the defendant, P. B. Marshall; have known him about a year and a-half. I live in the town of Graham, Young County. After the defendant, P. B. Marshall, and Shockley were arrested for the murder of Dora Dees, and while the said Marshall was under arrest, the deputy-sheriff brought him down to my house. While there he said to me, 'I want you to go and see Shockley, and tell him he must leave the country, and that if he will leave, I will furnish all the money he wants.' I made no reply. The deputy-sheriff was close enough to have heard

this conversation; can't say whether or not he did hear it. It was in a low tone of voice."

Objection to the evidence was that defendant was in the custody of the officer at the time such declaration was made. Whether coming strictly and technically within the legal definition of a confession or not, it is evident that in its effect and the use it was intended to subserve, in connection with the other circumstances, it must have been introduced by the State as an equivalent to an admission or confession of guilt which could only be obviated by getting the principal State's witness out of the country. In this view, was the evidence admissible?

The rule prescribed by the statute is that "the confession of a defendant may be used in evidence against him, if it appear that the same was freely made, without compulsion or persuasion, under the rules hereafter prescribed." Pasc. Dig., art. 3126.

"Art. 3127. The confession shall not be used if, at the time it was made, the defendant was in jail or other place of confinement, *nor while he is in custody of an officer*, unless such confession be made in the voluntary statement of the accused, taken before an examining court in accordance with law, or be made voluntarily, after having been first cautioned that it may be used against him," etc.

Now, in order properly to arrive at the gist of the question, let us suppose that the defendant, instead of telling the witness Lawrence to get Shockley to leave the country, had told the witness outright and absolutely that he had poisoned the deceased, would such testimony by Lawrence have been admissible? Clearly not. Why? Because the defendant at the time it was made was in custody, and had not been warned. If, then, he could not have testified to a confession directly admitting the *corpus delicti*, how could a confession of a collateral matter going to establish a matter directly connected with the *corpus delicti*, and essential to its proof,

be admissible in evidence against him? The distinction between the two is not perceived. " When the confession of a defendant to the main fact in issue would not be admissible, it is, as a general rule, inadmissible to permit evidence of collateral facts by which it was necessary to establish the main facts." *Haynie* v. *The State*, 2 Texas Ct. App. 168; *Davis* v. *The State*, 2 Texas Ct. App. 588; *Taylor* v. *The State*, 3 Texas Ct. App. 387.

Under these rules, the admission of the testimony of the witness Lawrence was, in view of the circumstances stated in the exception, an error which would alone, of itself, necessitate a reversal of the judgment. We propose, however, to notice one or two other errors complained of.

The sixth bill of exceptions raises the question of practice as to the nature and extent of the questions to be asked with regard to the impeachment of a witness for truth and veracity in the neighborhood in which he lived. After the witnesses had stated that they knew the witness's character for truth and veracity in the neighborhood in which he lived, and that it was bad, defendant's counsel proposed to ask each of the impeaching witnesses the further question, " From that reputation, would you believe him upon oath?" which question was, on motion of the district attorney, excluded, upon the ground that it was unnecessary. As put, the question was doubtless incorrect. The mode and manner of impeaching a witness for truth and veracity was maturely considered and elaborately discussed in the able opinion of Bell, J., in *Boon* v. *Weathered*, 23 Texas, 675, and all the leading authorities examined and reviewed. Summing up the result of his investigation of the subject, he says : " Where the impeaching witness is asked ' whether or not he could believe the other on oath,' he is more likely to give an answer suggested by his personal knowledge, or prompted by his personal feelings, or his individual opinion, than he is when asked whether or not he is acquainted with

the general reputation of the impeached witness for truth, and whether it is good or bad. If the impeaching witness states that he is acquainted with the general reputation of the former witness for truth in the community where he lives, *he may then properly be asked whether that general reputation is such as to entitle the witness to credit on oath;* or any other form of words may be used which do not involve a violation of the cardinal principles that the inquiry must be restricted to the general reputation of the impeached witness for truth in the community where he lives, or where he is best known, and that the impeaching witness must speak from general reputation or report, and not from his own private opinion." He says : "I think these conclusions are sound upon principle, and are supported by the most numerous and best considered authorities." 23 Texas, 675.

The last subjects which we propose to notice are the errors complained of in the second ground of the motion for a new trial, and the ground set forth in the second subdivision of the assignment of errors. In the motion for a new trial the error is thus stated : "That the cause of said defendant has been fatally prejudiced by the want of proper skill and management of his case by his counsel employed to defend him. The senior counsel in said defence was, during the pending of the trial of this cause, suspended from practising law by this court for malpractice, and only suffered to act as attorney-at-law during the further proceeding of said trial ; thereby the defendant was seriously prejudiced in the minds of the jury."

In the second assignment of errors we find the following statement, viz. : That "the court erred in allowing evidence of unprofessional conduct of the leading counsel in attempting to get a continuance, before the knowledge thereof was brought to the defendant, to come before the jury ; and permitting the attorneys for the prosecution to comment on the testimony having been so admitted as a circumstance of

guilt, notwithstanding the court charged the jury not to consider such evidence."

We have copied these two grounds of complaint more with a view of illustrating the necessity of an observance of the rules of practice than as points involved in the case.

If these errors were committed as alleged, then we can readily imagine how serious a damage might have been occasioned the cause of the defendant by having his leading attorney, in the presence and hearing of the jury, suspended from practice of the law for malpractice in the case then on trial by the jury; and we can also imagine the damage and wrong which might have been done by permitting attorneys for the prosecution to comment on such facts and circumstances in their argument of the case to the jury. But are there such facts in this case, which can be considered by us? Certainly not; there are no corresponding bills of exceptions, and they may be the mere unsupported assertions of counsel, for aught that appears in the record. If such proceedings did occur, then defendant's counsel should have saved a bill of exceptions, stating the facts and circumstances in full, and have presented it to the district judge for allowance; and if he refused to sign and certify the same, then have it authenticated by bystanders, as the law provides. This is the only mode by which such irregularities can properly be saved and presented for action and revision in this court. As they are presented in this record, no matter how grave or serious they might appear, we can take no notice of them, because they do not come before us as noticeable facts properly raised, and connected with and growing out of the case as tried in the court below.

As stated above, the judgment will be reversed because of error committed in admitting proof of admissions or *quasi*-confessions made by defendant whilst in custody.

*Reversed and remanded.*