HANNAH BOON v. F. M. WEATHERED'S ADMINISTRATOR.

In the impeachment of a witness, the inquiry should be confined to his general reputation for truth, and should not extend to his general moral character.

A witness can be impeached by general evidence only, and not by evidence as to particular facts.

A witness may know and speak as to another's reputation for truth, although he may not have heard it discussed, and does not know what a majority of his neighbors say or think of his character for truth.

A man may have a general character as to which a witness may testify, without that character ever having been discussed.

Though not the only proper questions that may be put, yet the *formula* given by Mr. Swift, in his work on evidence, for the examination of a witness, introduced for the purpose of impeaching another witness, seem freer than any other from objection.

A form of words should not be adhered to, so as to defeat the object sought to be obtained.

Inquiry, having due regard to the object to be obtained, the character of the witness for truth and veracity, should be made in a manner suited to the occasion, and capacity of the witness.

A man whose general character is bad, may possess such a degree of veracity as to be entitled to credit upon oath; whether he does so or not, can only be ascertained by an inquiry into his character for truth.

To infer a want of credibility, from the fact of the witness's general bad character in the neighborhood where he lives and is best known, would be an inference on an inference, and not on the facts, and without a knowledge of the facts on which the first inference reposed.

It would also be an inference from public opinion, which had not been drawn by the public.

Unless the inquiry be addressed to the character of the witness for truth, if, although of general bad character, his character should be good in that respect, the burden of proof, as to the true subject of inquiry, would be shifted from the party on whom it ought to rest.

The testimony of a witness, attempted to be impeached, is always before the jury; his credibility is a question for them, and it is not proper for the court, upon an assumption that he is infamous, to instruct the jury to disregard his testimony.

ERROR from Shelby. Tried below before the Hon. A. W. O. Hicks.

The only question involved in this case, was, as to the proper

mode of impeaching a witness; it is therefore unnecessary to state the facts.

*W. W. Wallace,* for the plaintiff in error.

*Richard S. Walker,* for the defendant in error.

BELL, J.—This cause was before this court at a former term. The report of it will be found in 17 Texas Rep. 143. On the first trial of the cause in the District Court, the plaintiff, Hannah Boon, recovered a judgment. That judgment was reversed by this court, because there was no proof that Francis M. Weathered had any notice of the claim of Hannah Boon, at the time he purchased the land certificate from Watson. It was held, that the legal title to the certificate was in Watson, and that if Weathered purchased from Watson, without notice of Mrs. Boon's claim, he would take the certificate discharged of the trust which existed as between Mrs. Boon and Harrison E. Watson.

On the last trial of the cause in the District Court, E. O. Legrand, a witness for the plaintiff, testified, that he had informed Francis M. Weathered, of the claim of Mrs. Boon to one half of the land certificate in question, previous to the purchase by Weathered from Watson. This testimony was of vital importance to the plaintiff's case, as will be seen by reference to the opinion of this court in 17 Texas Rep. 143. The defendant called several witnesses, for the purpose of impeaching the testimony of the witness, Legrand. Two of these witnesses, T. G. Brooks and H. W. Kinsey, stated in general terms, that Legrand was a man whose general character was bad. Of the other impeaching witnesses, one stated that Legrand's general reputation was bad, but he afterwards said, he would not speak on the subject of Legrand's reputation for truth and veracity, as he was not informed on that subject. Another one of them stated, that Legrand's general reputation was bad, but said, that he served on juries, was sworn in the courts as a witness, and that he (the witness) would believe Legrand, when he testified

under oath; but if he was confined to his general reputation, he would not give credence to his testimony. The remaining one of the impeaching witnesses, stated, that he believed Legrand's reputation for truth and veracity was fair. Several witnesses were then introduced to sustain the credibility of the witness, Legrand. These witnesses, five or six in number, all stated, that Legrand's general reputation as a dealer in spurious land certificates was bad; but they said, that they had heard his reputation for truth and veracity discussed, and they believed his reputation in that respect to be fair. The statement of facts concludes with these words: " All of the witnesses sworn in this cause said his (Legrand's) general reputation, as an honest man, was bad, but some referred this general reputation to his rumored dealings in spurious or fraudulent head-rights; none said his general reputation for truth and veracity was bad."

With reference to the testimony of the witness, Legrand, and the testimony of the impeaching and supporting witnesses, the judge instructed the jury as follows: " If you are satisfied from the evidence, that any witness who has testified before you, is a man of bad character, from general reputation, in relation to his dealing in fraudulent land certificates, and hence a man of bad character, such man is not worthy of belief, and you will not believe his testimony; because he is in law infamous and unworthy of belief." We think there was error in this charge of the court, and that it necessarily misled the jury as to the law. The motion for a new trial, which was overruled, pointed out distinctly the error in the charge, and the ruling of the court upon the motion for a new trial, is one of the errors assigned.

The statement of facts, and the bill of exceptions, taken together, present some confusion. It is said in the bill of exceptions, that the defendant offered to prove, that Legrand was a dealer in fraudulent and forged certificates, and that he used forged seals, &c., but, that the court sustained an exception to this mode of interrogation, and restricted the defendant to proof of general bad character, " without going into the fact as to what it consisted in." It is also stated in the bill of exceptions,

that "all the testimony as to what the general character of Legrand consisted in, was offered by plaintiff in rebuttal." The facts are no doubt as stated in the bill of exceptions, though the statement of facts would make a different impression. We learn then, that the judge was of opinion, that, in impeaching a witness, the inquiry is properly as to his general moral character. This is indicated by authorities to which the judge makes reference in his charge. We learn also, that he admitted the right of the party, calling the impeached witness, to cross-examine the impeaching witnesses, as to the facts or circumstances from which the general bad character of the impeached witness resulted. We think these views are erroneous, but the judge's charge goes further than this, and assumes, in effect, that infamy may result, in contemplation of law, from the fact, that a man is addicted to a single vice; or in other words, the effect of the charge is, that if a man is shown to be a swindler, he is not entitled to any credit as a witness, and his testimony shall not be at all regarded by a jury.

It is remarkable, that the proper manner of impeaching a witness has not yet been clearly settled in practice; and it is even more remarkable, that the principles upon which the testimony of witnesses may be discredited, are yet the subject of discussion amongst lawyers. I find that even the English authorities are not entirely agreed on this subject, while in this country there has been quite a diversity of opinion and of decision. The question upon which the difference of opinion exists is, whether, in the impeachment of a witness, the inquiry is to be confined to the general reputation of the witness for truth, or whether the inquiry should be concerning the general moral character of the witness.

The authorities are all in unison upon one point, and that is, that the credit of a witness can be impeached by general evidence only, and not by evidence as to particular facts. For this rule the plain and obvious reason is given, that a man may be supposed ready at all times to defend his general reputation, but not to answer accusations which relate to particular facts; and

the additional reason is given, that a court cannot turn aside from a main inquiry to try collateral issues.

Mr. Starkie says, that "the proper question to be put to a witness, for the purpose of impeaching the general character of another witness, is, whether he could believe him upon his oath." Of course, as preliminary to this, the impeaching witness must qualify himself, by stating that he is acquainted with the general reputation of the witness, whose testimony it is sought to impeach. Mr. Swift, in his work on evidence, says, that "the only proper questions to be put to the impeaching witness, are, whether he knows the general character or reputation of the witness intended to be impeached, in point of truth, among his neighbors, and what that character is? whether good or bad?" This author says: "the (impeaching) witness may be inquired of as to the means and opportunity he has of knowing the character of the witness impeached; but his testimony must be founded on the common repute and understanding of his acquaintance, as to truth, and not as to honesty," &c. Mr. Phillips, in his Treatise on Evidence, states, that the regular mode of impeaching a witness, is to inquire "whether the impeaching witnesses have the means of knowing the general character of the impeached witness, and whether, from such knowledge, they would believe him on oath?" This form of proceeding was sanctioned by Lord ELLENBOROUGH, in the case of Manson v. Harsink, 4 Esp. Cas. 102, which authority is quoted by Phillips and Starkie, but I have not had access to the case. In the English courts, so far as I have been able to inform myself, the differences of opinion that may have existed, as to the proper mode of proceeding to impeach a witness, have not arisen from any substantial difference as to the principles involved. In the English courts, the inquiry is always directed, in one form or another, to the character of the impeached witness, for truth.

In this country, the opinion has prevailed, to some considerable extent, that in impeaching a witness, the inquiry should be concerning his general moral character, without restricting it to his character for truth. This opinion was expressed by Senator

Tracy, in the case of Bakeman v. Rose, 18 Wend. 146, though such was not the opinion of the court. The same views have been expressed in Kentucky, in the case of Hume v. Scott, 3 A. K. Marshall, 261; also in North Carolina, in the case of The State v. Boswell, 2 Dev. Law Rep. 209; also in Alabama, in the following cases, Ward v. The State, 28 Ala. 53; Sorrelle v. Craig, 9 Id. 534.

In the case of Bakeman v. Rose, Senator Tracy said: "If the inquiry be confined to the general reputation of the witness amongst his neighbors, it will happen in some cases, that a witness whose general moral character is deservedly infamous, is allowed to impress his testimony on the jury, with unqualified weight, simply because mendacity may have been relatively too insignificant an item, in the catalogue of his vices, to have attracted the attention, or elicited the remark of his acquaintance." It the case of Hume v. Scott, 3 A. K. Marshall, Judge MILLS said, that "persons of infamous character may, and do frequently exist, who have formed no character as to their lack of truth, and society may have never had an opportunity of learning that they are false in their words or oaths." I think these propositions are sophistical, and result from a mistake of the law. These views assume, that a witness can only speak as to another's reputation for truth, after it has been matter of discussion amongst his neighbors. This, we think, is an error, which lies at the foundation of these opinions, and which has been productive of much inconvenience in practice, and has too often led to a subversion of justice.

In the case of Hadjo v. Gooden, 13 Ala. 718, Chief Justice COLLIER held, that a witness was competent to testify as to the character of an impeached witness, although the witness said that he knew only a portion of the neighbors of the impeached witness, and had never heard any of them speak of his character for truth, and had never heard it called in question. In the case of Dave v. The State, 22 Ala. 23, Judge GIBBONS said, that a witness was competent to speak of another's general character, without being able to say, that he knew what a ma-

jority of the neighbors, of the person whose character was the subject of inquiry, said of him, or thought of him. The judge in that case said, "It may so happen, that a man has a reputation well established, either good or bad, and yet a majority of his neighbors may never have spoken upon the subject, or expressed their thoughts in any manner whatever;" again, "there may not have been a majority, who have expressed an opinion to the witness, nor may he be able to say, with positive knowledge, what a majority think; nor may he have heard any one else say, what a majority said, or thought, and yet himself be competent to swear, what his general reputation is. A person's position in a community, may be so obscure, that very few of his neighbors know anything of him; his general character may be very circumscribed. To hold, that he could not prove his general character, except by witnesses, who could swear as to what the majority of his neighbors said, or thought of him, would be to deprive him of the benefit of this species of testimony."

These views, we think, are correct, and announce to a certain extent, the principle which was lost sight of by Senator Tracy, in the case of Bateman v. Rose, and by Judge Mills, in the case of Hume v. Scott. That principle is, that a man may have a character for honesty, or for veracity, or for being a peaceable citizen, without his honesty, or his veracity, or his peaceable disposition, ever having been discussed by his neighbors. It would be a great blemish upon the law, if a man who had lived for fifty years above all reproach, should not be able to prove his character for honesty, or for veracity, because no one had ever heard either the one or the other called in question. The truth is, that as to the mode of proceeding in the impeachment of a witness, forms of words have been too much adhered to; and this adherence to a mere form of words, has made it so difficult to attain the ends of justice, that courts, in seeking for a remedy for practical difficulties, have lost sight, to some extent, of sound principles.

When a man's honesty, (I mean his correctness in business

44

transactions,) is in question, his veracity is not in question. When his veracity is in question, one cares not to know whether he be of a peaceable, or of a quarrelsome disposition. If the question is concerning honesty, the inquiry should be concerning honesty. If the question be one of veracity, the inquiry should be directed to the point at issue. And in making an inquiry, concerning veracity, there is no reason why a form of words should be adhered to, that in many cases will defeat the very object, which it is sought to attain. The inquiry, having due regard to cardinal principles, should be made like any other inquiry, in the manner suited to the occasion. If the capacity of the witness is such, that he cannot be made to comprehend one mode of interrogation, then the matter should be brought down to the level of his capacity, and questions proposed in such manner, as to elicit the information which the witness possesses.

I have been led to make these observations, because it frequently happens in practice, that when an attempt is made to impeach a witness, the judge prescribes some form of question, as the proper one to be used. This form of question may be one which the witness cannot fully comprehend; and though the witness may be possessed of the desired information, the attempt to elicit it fails. For an example, a witness is sometimes asked, " are you acquainted with the general reputation of A. B. for truth and veracity, in the community in which he lives?" The witness may answer, "I never heard the reputation of A. B. for truth and veracity, questioned or talked about in the community in which he lives." There the whole matter stops; and yet the witness may have lived within a stone's throw of A. B., for a score of years.

But the main argument used by those who think that in impeaching a witness, the inquiry ought to be as to his general moral character, is derived from the kindred nature of vices. In the case of Hume v. Scott, the judge said: " Every person conversant with human nature, must be sensible of the kindred nature of the vices to which it is addicted. So true is this, that to ascertain the existence of one vice, of a particular character,

is frequently to prove the existence, at the same time, of more in the same individual." Now this may be admitted to be altogether true, but the argument which is sought to be derived from it, lacks force, just in the degree that the facts assumed are incapable in their nature, of furnishing any certain rule for the guidance of the mind. In the same case, the learned judge says further: "By the character of every individual, that is, by the estimation in which he is held in the society or neighborhood where he is conversant, his word and his oath is estimated. If that (meaning his character) is free from imputation, his testimony weighs well. If it is sullied, in the same proportion his word will be doubted." This, I think, is very nearly equivalent to saying, that a man's character for truth can always be ascertained. If a man is worthy of credit, just in proportion as his general character is free from imputation, why not speak of his credibility instead of speaking of his general character?

But observation of human nature has not established it as an infallible truth, that the existence of one vice in an individual, is proof of the existence of another. As was said by Chief Justice BOYLE, in the case of Noel v. Dickey, 3 Bibb, 268: "It is an observation no less true than trite, that no one is entirely virtuous or entirely vicious. Such indeed is, in general, the preponderance of the virtue or vice of individuals, as to entitle them to the general character of good or bad; but we cannot, merely from knowing what the general character is, say with certainty, what vice or virtue, enters into its composition. If, therefore, we would form a correct judgment of a man, with regard to any particular vice or virtue, it is necessary we should be informed of his character, in that particular respect. This is more especially necessary, as regards a man of bad character, for frequently a single vicious habit, and sometimes even a solitary vicious action, is sufficient in the common estimation of mankind, to give to a person a general bad character. A person, therefore, whose general character is bad, may, notwithstanding, possess such a degree of veracity, as to entitle him to credit upon oath;

and whether he does so or not, can only be ascertained by an inquiry into his character for truth."

I have quoted the observations of this eminent judge at some length, because I think their force cannot be denied. And if the truth of the foregoing remarks be admitted, there is no escape from the conclusion which is forced upon us. That conclusion is, that in order to ascertain whether a man is credible or not, an inquiry must be made into his character upon that particular point. No one can be so bold as to deny, that if a man be worthy of credit under oath, notwithstanding a general bad character in other respects, then no person to whom his testimony is of value, should be robbed of it upon any ethical theory concerning the kindred nature of vices. It may be only in the verse of the poet, who has drawn, with inimitable power, the character of the piratical chief, that we find one virtue linked with a thousand crimes. But if, without taxing our credulity to that extent, it can be asserted to be, indeed, true, that a man may preserve his veracity, amidst the general wreck of his character; if,

> "All other virtues gone,
> Not guilt itself could quench this loveliest one;"

then the law could not claim to be the perfection of reason, if it should withhold its respect from that virtue, which had preserved its integrity when deprived of every support.

And I think that the rule which restricts the inquiry concerning the general character of a witness, to his reputation for truth, is in conformity with the well established analogies of the law, in all cases where character becomes the subject of judicial inquiry. For example, where a man is charged with larceny, he may prove his general character for honesty; where personal violence is imputed to him, he may prove his general character as a peaceable citizen; in actions by the husband or father for seduction, the previous general character of the wife or daughter for chastity, may be inquired into; "And in all cases," says Mr. Greenleaf, "where evidence is admitted touching the general

character of the party, it ought manifestly to bear reference to the nature of the charge against him."

At the expense of being very tedious, I cannot forbear quoting from the opinion of Judge McLEAN, in the case of the United States v. Vansickle, 2 McLean's Circuit Court Rep. 219, on the subject now under discussion. Speaking of the examination of the impeaching witnesses, the judge said, " The object of the examination is, to shake and overthrow the credit of the witness. Now this is effectually done, by showing that in the neighborhood in which he lives, and where his character is best known, he is not considered worthy of credit. Shall a public opinion, which does not reach his credibility, be proved as a fact from which the jury may infer a want of credibility? This would be an inference from public opinion, which had not been drawn by the public. It would be a conclusion inferred not from original facts, but from an opinion formed on those facts by the public. It would be an inference on an inference." And the judge might have added, that the latter inference would be drawn without a knowledge of the facts on which the first inference reposed.

But I think that the unsoundness of the rule laid down in the case of Hume v. Scott, may be shown from the practical operation of the rule itself. It cannot be denied, and the case in 3 Bibb, 268, is precisely to this point, that after the impeaching witness has stated that the impeached witness is a man whose general moral character is bad, the party whose witness is impeached may inquire, on cross-examination, concerning the character of the impeached witness for veracity. This evidence, then, which concerns the character of the witness for veracity, and which is brought out on cross-examination, is competent evidence for the jury, and shows that the true issue is upon the question of veracity. If the witness called to impeach the former one should say, on direct examination, that the witness was a man whose general moral character was bad; and should then say, on cross-examination, that notwithstanding his bad general character, he had always preserved his veracity above suspicion,

surely the cross-examination would destroy the force of the direct examination. And this being so, it shows not only that the true inquiry is concerning the reputation of the witness for truth, but it shows, also, that the rule which permits the inquiry to be made concerning character generally, shifts the burden of proof upon the true issue; from the party holding the affirmative of that issue, and places it upon the party holding the negative.

If these views be correct; if, in the impeachment of witnesses, the inquiry should practically be restricted to the general character of the impeached witness for truth, then the mere mode of procedure is a matter of secondary importance. I think that the questions quoted from Swift, though not "the only proper questions that can be put," as that author declares, are upon principle, more entirely free from objection than the question stated by Starkie, or the form of question which was approved by Lord ELLENBOROUGH, in the case of Mawson v. Harsink. Where the impeaching witness is asked "whether or not he could believe the other on oath," he is more likely to give an answer suggested by his personal knowledge, or prompted by his personal feelings, or his individual opinion, than he is when asked, whether or not he is acquainted with the general reputation of the impeached witness, for truth, and whether it is good or bad. If the impeaching witness states that he is acquainted with the general reputation of the former witness, for truth, in the community where he lives, he may then properly be asked whether that general reputation is such as to entitle the witness to credit on oath; or any other form of words may be used, which do not involve a violation of the cardinal principles, that the inquiry must be restricted to the general reputation of the impeached witness for truth, in the community where he lives or is best known; and that the impeaching witness must speak from general reputation or report, and not from his own private opinion. I think these conclusions are sound upon principle, and are supported by the most numerous and best considered authorities.

It may be remarked, that when the attempt is made to impeach a witness, his testimony is always before the jury, and the

question of his credibility is always a question for the jury. It is never proper, in such a case, for the court to assume that a witness is shown to be infamous, and unworthy of credit, and to instruct the jury to disregard his testimony. The question of the competency of a witness is always for the court; the question of his credibility, never.

These views, which are expressed so much at length, because we have not the time to condense them, will show, that, in our opinion, the judgment of the court below must be reversed. The whole law of the case was settled by the former opinion of this court, and it is therefore unnecessary to extend this opinion to any greater length. The judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.

ROBERTS, J., did not sit in this case.