## J. M. HOLBERT *v.* THE STATE.

1. EVIDENCE — PRACTICE. — Questions respecting the mode of examining a witness, or relative to the scope of interrogation allowable in the examination, should be raised and disposed of while the witness is on the stand. Controversy between counsel on such matters cannot be adjusted by requesting special instructions upon them to be given to the jury.

2. SAME — IMPEACHMENT OF WITNESSES. — In attempting to impeach the credibility of a witness by proof of his general character, the impeaching witness is first to be interrogated upon his knowledge of the general reputation for truth of the assailed witness where the latter resides or is best known. If the impeaching witness appears sufficiently acquainted with such reputation, he should next be asked whether it is good or bad; and if he states that it is bad, he may be further asked whether, in view of such reputation, the assailed witness is worthy of belief on his oath, but not whether he, the impeaching witness, would believe him.

3. SAME. — The inquiry must be limited to the general reputation of the assailed witness for truth, and the impeaching witness must predicate his testimony on that reputation, and not upon his personal knowledge or opinion.

4. SAME. — An impeaching witness is amenable to cross-examination in like manner and to the same extent as other witnesses, and the reputation and credibility of the assailed witness may be vindicated by independent proof.

APPEAL from the District Court of Milam. Tried below before the Hon. S. FORD.

This appeal is from the conviction of the appellant for an assault with intent to murder one J. C. Yarborough. A term of five years in the penitentiary was the punishment allotted the appellant.

Inferentially it appears from the evidence that ill-will had arisen between Yarborough and the appellant on account of

some dealings between the latter and a tenant of Yarborough with reference to the crop on the rented land. About the middle of November, 1877, as Yarborough was hauling some corn away from the rented place, he was fired upon from the bushes near the road, and received one shot in the breast and another in the left arm. He did not recognize the person by whom he was shot. Two or three weeks before that event, according to his testimony, the appellant told him he had better not go to the rented place for any corn, and said that if he (the witness) did go he would not get back alive. Appellant had bought out the witness's tenant some months previously. After witness was shot, Barnes Parker, his father-in-law, who was riding behind the wagon, took him to the nearest house. In consequence of the wounds he was laid up for about a year and a half. Immediately after the shooting he heard Mr. Parker call out, " You wretch ! I know you."

Barnes Parker, for the State, testified that he had been helping Yarborough gather the corn, and as they were returning to the latter's house with a load, and when they got about half a mile from the field, the appellant, who was well known to the witness, stepped from behind a tree about thirty yards distant, and fired. Witness thought at the moment that he was himself the target, but it proved otherwise. Yarborough was sitting on the load of corn and was driving the two-horse team hauling it. He hallooed as he was shot, and witness, according to his recollection, called out, " I know you, Mr. Holbert, you cursed wretch !" A man named Keith had been riding alongside of witness in rear of the wagon, and as the shot was fired Keith instantly disappeared in the bushes. Two shots were fired by the appellant.

The defence introduced Albert Keith, who was with Parker in rear of the wagon when Yarborough was shot. Keith testified that when the first shot was fired he looked, but could not see any one. He immediately took to the

woods, and heard the second shot after he started. He did not hear Parker call Holbert's name.

A number of witnesses testified that Parker's reputation for truth was bad in that section of the country. Several of them were settlers on an extensive tract of land claimed by Parker, and one witness, who was not a settler on the land, stated that it was the interest of the settlers to discredit Parker.

The State, in rebuttal, introduced several witnesses who testified that they knew Parker's reputation for truth in the city of Austin, of which he had been a resident for several years, and that it was good. Other witnesses testified to seeing the appellant in the neighborhood where Yarborough was shot, and on the day of that event, carrying a gun. He had ridden from his home in company with a lady, but left her to return home, as he said, for some money he had forgotten.

The defence proved that the appellant was in the habit of carrying his gun, but made no effort to prove an *alibi*, or that he did return home after leaving the lady in the neighborhood where the shooting was done.

*W. K. Homan*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J. It is shown by bill of exceptions that, "the defendant having introduced testimony for the purpose of impeaching the State's witness Barnes Parker, the district attorney in his closing argument to the jury argued that they could not regard the said Parker as having been impeached, because the impeaching witness, though testifying that the general reputation of said Parker for truth and veracity in the community where he lives is bad, had not been asked whether from such reputation the said Parker is entitled to be believed on oath. Wherefore, after the con-

clusion of the argument to the jury, the defendant by his counsel asked the court to instruct the jury that the regular mode of impeaching a witness is to inquire of the impeaching witness whether he knows the general reputation of the person in question among his neighbors, and what that reputation is, and it is not competent for the impeaching witness to give his opinion as to whether or not the person in question is entitled to credit on his oath." The court declined to instruct the jury as requested, and counsel for the defendant took a bill of exceptions to the ruling of the court.

In another bill of exceptions it is recited that, "the defendant having introduced testimony for the purpose of impeaching the State's witness Barnes Parker, the court instructed the jury on the subject of said impeaching testimony as follows: 'In regard to the impeaching evidence before you, you are charged that such evidence is not admitted for the purpose of excluding the evidence of the witness sought to be impeached entirely from the jury, but it is admitted for the purpose of enabling the jury the better to weigh the evidence of the witness sought to be impeached, and to determine what credit, if any, to give it.'" This bill further shows that the defendant's counsel excepted at the time to this instruction with reference to the testimony of the impeaching witness, and excepted also to the general charge of the court as a whole.

The portion of the charge of the court stated in the bill of exceptions is a portion of the sixth paragraph of the charge of the court. The remaining portions of the paragraph are the following: "You are the sole judges of the weight of the evidence and of the credibility of the witnesses. It is the province and duty of the jury to consider and weigh all the evidence before them, and give such credit to the evidence of the witnesses as they deem it entitled to."

We are of opinion that the matters complained of relate to a matter which had but one appropriate place on the trial.

If it was intended to raise a question as to the extent of the evidence of the impeaching witnesses, the proper time and opportunity was afforded the parties whilst the witnesses were on the stand. If it had been intended to invoke a ruling of the court as to whether the examination should be confined to the general character of the witness sought to be impeached, for truth and veracity among his neighbors, or whether it should be extended to the opinion of the respective witnesses as to whether they would consider his oath entitled to credit or not, that matter could have been settled by propounding to the witnesses such appropriate questions as would have elicited a direct answer. In such a case, an objection being raised to the question and the answer sought to be elicited, the court would have been required to rule; and by a bill of exceptions which properly presented the subject, signed by the judge, or in the manner required by law for perpetuating the fact in case of a refusal of the judge to certify, the question would have been presented in a manner required by law, and would not only have invoked a ruling by this court, but would have so presented the question as that this court could have acted understandingly in deciding the question.

In the present case, agreeably to the bill of exceptions, the question seems to have been raised for the first time by the district attorney in his concluding argument, which seems to have been followed by a charge asked by counsel for the defendant, and which the court refused to give to the jury. The controversy seems to be this: The district attorney took the position in argument that the State's witness had not been successfully impeached, for the reason that the impeaching witnesses had not been asked whether, from the general reputation of the State's witness, he " is entitled to be believed on oath;" whilst the charge asked by the defendant's counsel assumes the law to be that the impeaching witnesses should be confined to the general reputation of the witness whose testimony is sought to be impeached,

and that it is not competent for the impeaching witness to give his opinion as to whether or not the person in question is entitled to credit on his oath.    It will readily be perceived that the precise question involved is as to the extent to which the examination of the impeaching witnesses should be extended,    We are of opinion, as already intimated, that this is a question which could not be legitimately raised for the first time either in argument or by a charge to the jury ; that it should have been raised on the examination of the witnesses, and, not having been done then, it was too late to raise it at some subsequent stage of the proceedings.    We are therefore of opinion that there is no such error presented by the bill of exceptions as worked any injury to the rights of the defendant.

It may not be amiss, however, in view of the argument of counsel for the appellant, to say that, in our view of the authorities, the general rule as laid down by Mr. Greenleaf in his work on Evidence (vol. 1, sect. 461) is not sustained to the extent to which the author goes.    He says that the regular mode of examining into the general reputation of a witness whose testimony it is sought to impeach is to inquire of the witness whether he knows the general reputation of the person in question among his neighbors, and what that reputation is.    He then says that in the English courts the course is further to inquire whether, from such knowledge, the witness would believe the prisoner upon his oath.    The authorities, so far as examined, seem to support this statement as to the course pursued in the English courts. Phil. & Am. on Ev. 925 ; 4 Esp. 104 ;  1 Stark. on Ev. 182 ; 10 Ves. 50.    To this extent there seems to be but little controversy.    The learned author, however, makes this further statement, following in immediate connection with what is said as to the rule in the English courts, as quoted above : " In the American courts the same course has been pursued, but its propriety has of late been ques-

tioned, and perhaps the weight of authority is now against permitting the witness to testify as to his own opinion."

This latter expression, as to the propriety of the English rule having of late been questioned, and that perhaps the weight of authority is now against permitting the witness to testify as to his opinion, has itself been not only questioned as not a correct enunciation of the law, but in very many American courts the contrary course has been pursued. Notably, in Texas, is the case of *Boone* v. *Weathered*, 23 Texas, 675, determined by the Supreme Court of the State in 1859. In that case, whilst the position assumed by Mr. Greenleaf is not mentioned, quite a number of authorities are cited and reviewed, and the conclusion seems finally to be reached that in impeaching the character of a witness the inquiry must be directed to his general character for truth, and not to his general character in other respects, and that the English rule, which permits the impeaching witness to be further interrogated whether he could or could not believe the one sought to be impeached, on oath, is in some form a proper one. We make the following quotation from the opinion : " When the impeaching witness is asked whether or not he could believe the other on oath, he is more likely to give an answer suggested by his personal knowledge, or prompted by his personal feelings or his individual opinion, than when asked whether or not he is acquainted with the general reputation of the former witness for truth in the community where he lives. He may then properly be asked whether that general reputation is such as to entitle the witness to credit on oath ; or any other form of words may be used which do not involve a violation of the cardinal principles that the inquiry must be restricted to the general reputation of the impeached witness for truth in the community where he lives or is best known, and that the impeaching witness must speak from general reputation or report, and not from his own private opinion. I think these conclusions are sound upon principle, and are supported by the most

numerous and best considered authorities." We might rest
our investigation with the case of *Boone* v. *Weathered*, as
the leading case in Texas on the subject under consideration,
and on *Johnson* v. *Brown*, 51 Texas, 65. But the authori-
ties at hand lead us to conclude that the rule of Mr. Green-
leaf as to the doctrine of American courts on the subject
fails of the support the authorities generally give to his de-
ductions. In *Hamilton* v. *The People*, 29 Mich. 195, Camp-
bell, J., delivering the opinion of the court, says : "Until
Mr. Greenleaf allowed a statement to creep into his work on
Evidence, to the effect that the American authorities disfa-
vored the English rule, it was never seriously questioned "—
citing 1 Greenl. on Ev., sect. 461. Judge Campbell pro-
ceeds : " It is a little remarkable that of the cases referred
to, to sustain this idea, not one contained more than a pass-
ing *dictum*, not in any way called for." He proceeds to
review the cases as to what was involved in each, and then
says : " The jury, if they do not act from personal knowl-
edge, cannot understand the matter at all without knowing
the witness's opinion and the ground on which it is based.
It is the same sort of difficulty which arises in regard to in-
sanity, to disposition or temper, to distances and velocities,
and many other subjects, when a witness is required to show
his means of information and then state his conclusions or
belief based on those means. If six witnesses were merely
allowed to state that a man's reputation is bad, and as many
say it is good, without being questioned further, the jury
cannot be said to know much about it. Nor would any
cross-examination be worth much unless it aided them in
finding out just how far each witness regarded it as tainted."
In another paragraph of the opinion, the same judge further
says : " So far as the Reports show, the American decisions,
instead of shaking the English doctrine, are very decidedly
in favor of it, and have so held upon repeated and careful
consideration ; and we have not been referred to, nor have
we found, any considerable conflict." He cites in New

York *The People* v. *Mather*, 4 Wend. 229 ; *The People* v. *Rector*, 19 Wend. 569 ; *The People* v. *Davis*, 19 Wend. 309. In New Hampshire, *Titus* v. *Ash*, 4 Fost. 319. In Pennsylvania, *Boyle's Executors* v. *Krutzer*, 46 Pa. St. 465 ; *Lyman* v. *Philadelphia*, 56 Pa. St. 488 ; and other cases in Maryland, California, Illinois, Wisconsin, Georgia, Tennessee, Alabama, Kentucky, and in United States Circuit Reports — as, for instance, *United States* v. *Van Sickle*, 2 McLean, 219.

We have had access to a later decision of the same court, in which the opinion was by the same judge as in Hamilton's case (*Keator* v. *The People*, 32 Mich. 484, decided in 1875), where the ruling in Hamilton's case seems to have been reaffirmed.

The authorities, both in Texas and elsewhere in America, seem clearly to support the position that on the subject of impeaching a witness the rule is the same, both in England and in America, and that the rule of the English courts is the true rule of the common law, both there and here.

All general rules are liable to exceptions, based upon peculiar circumstances. We are, however, of opinion the following general rules may be safely deduced from the authorities : When it is sought to impeach the character of a witness who has testified, by proving his general bad character by other witnesses, the course is to first interrogate the impeaching witness as to the former's general reputation for truth among his associates, or where he resides or is best known. Should he be conversant with that general character for truth, he may then be questioned as to whether it is good or bad, and, the witness appearing to be sufficiently acquainted with the character of the witness it is proposed to impeach, to testify thereto, and, stating that the general reputation for truth is bad, he may then be further interrogated whether the impeached witness is worthy of belief on oath, and not whether he would believe him ; that impeaching witnesses may be cross-examined as other witnesses, and with the same

latitude, and that the witness whose credibility is thus attacked may have his general character strengthened by other evidence; that it is not competent in investigations of this character to inquire into the general character of the witness to be impeached, except as to his general reputation for truth. A witness must speak from knowledge derived from general reputation, and not from his individual knowledge.

No rule can be laid down as to the form of questions asked of an impeaching witness. The examination must be so conducted as to be suited to the mental capacities and other peculiarities of the witness as developed on the examination; and, with these restrictions, the examination would generally be subject to the direction and control of the court in which the trial is had.

With reference to the matter set up in the second bill of exceptions, in our opinion the charge complained of can hardly be construed so as to have the effect claimed by counsel for the appellant. That portion set out in the bill, when standing alone, would, in our opinion, be unnecessary, to say the least; but when considered in connection with the remainder of the paragraph, and construing the whole clause of the charge, it seems to amount to nothing more than to inform the jury that the testimony of the witness Parker was not excluded from their consideration because of the attack upon it, but that this evidence went, with the other testimony in the case, to the jury for their consideration. The charge can hardly be considered as infringing on the province of the jury. The whole testimony was before the jury, and if they had rested a verdict upon the other State's witnesses, leaving out of view entirely the evidence of the witness Parker, it could hardly be said that there was not sufficient evidence to support the verdict and judgment. We know of no rule by which to determine what amount of credit a jury must give to one witness or to another, in estimating its value in their minds, in forming a verdict.

There is no material error in the charge of the court.. The proceedings seem to have been proper and legal, and the judgment of the District Court must be affirmed.

*Affirmed.*