No. 2794.

SAM GRIFFIN *v.* THE STATE.

MURDER—PRACTICE—IMPEACHMENT OF WITNESSES.—Two rules apply to and govern impeaching and sustaining testimony. First. The inquiry must be restricted to the general character of the witness sought to be impeached. Second. Impeaching or sustaining witnesses must speak from the general reputation, and not from their private opinions, as to whether the character of the impeached witness is good or bad for truth, or as to whether the general reputation of the impeached witness is such as to entitle him to credit on oath. See the opinion in extenso for a course of interogation in a trial for murder *held* to be subversive of these rules.

APPEAL from the District Court of Polk. Tried below before the Hon. Edwin Hobby.

The conviction in this case was in the second degree for the murder of Van Chambers, in Polk county, Texas, on the nineteenth day of October, 1887. The penalty assessed against the appellant was a term of five years in the penitentiary.

Matt Oliver was the first witness for the State. He testified that on or about October 19, 1887, the defendant came to his house to employ him to haul some cotton, which the witness agreed to do. While the defendant was at witness's house on that day, Van Chambers rode up, and came into the house. He and defendant did not speak to each other. Chambers, after remaining at the witness's house about five minutes, rode off in the direction of Mr. Franklin's place. About twenty minutes later, the defendant left, going in the direction of his home, the road to which led by Mr. Franklin's place, which is about a mile and a quarter distant from the witness's house. The road by Franklin's was the only one which led from the house of the witness to that of the defendant. A short time previous to the said October 19, 1887, a new road, forking from the Franklin place road at witness's house and leading to Chambers's house, was opened; since which time, in traveling home from witness's house, Chambers had generally traveled the new road. Previous thereto he had traveled the main road leading by the Franklin place. About three-quarters of an hour after Chambers left

witness's house, the witness saw his dead body at a point be-tween a half and three-quarters of a mile distant from his, witness's, house. It lay about ten feet from the road which led to Franklin's house, face down, with both arms underneath. The horse on which Chambers left witness's house, a short time before, stood over the body. There were three wounds in the body. One shot struck deceased near the middle of the back, a little to the left of the spinal column and beneath the left shoul-der blade. It did not pass out of the body. A second shot struck the rear of the right arm near the wrist, and came out on the opposite side, a little nearer the hand than where it entered. The third struck the middle finger of the right hand between the second and third joints, ranged down the finger and passed out at the back and between the first and second joints of the finger. A small wooden tooth or snuff brush was protruding from the mouth of the deceased. A pocket knife was found in the road about ten feet distant from the body, and a finger ring was found near the end of a log, a few steps distant from the body, in the direction of witness's house. Witness also observed human foot tracks in the road. He did not hear any of the shots, but was somewhat deficient of hearing. An ordinary horse can walk about four miles an hour.

T. J. Franklin testified, for the State, that on the evening of October 19, 1887, between the hours of one and two o'clock, he heard three reports of a gun or pistol, fired from a point on the main road between his house and the house of Mr. Oliver. Wit-ness was then in his field, about three hundred yards distant from where the shots were fired. Ten minutes later the de-fendant rode up to witness and asked him: "Mr. Franklin, how do you do?" Witness replied: "I don't feel very well to-day; how do you do?" He replied: "I don't feel well. I had to kill Van Chambers awhile ago. I am sorry I had to do it, but I was compelled to do it to save my own life." He then told the witness that he encountered the deceased on the road; that the deceased, who was standing in the road with his bridle rein over his arm, seized the rein of his, defendant's, horse, and attempted to pull him from the horse; that, in pulling loose, he, defendant, fell to the ground on the opposite side of his horse from deceased; that while getting up he saw the deceased cutting at him with a knife, whereupon he drew his pistol and fired three shots at deceased, who fell at the third fire.

Continuing, the witness said that he was the first person to

reach the body.    He saw the tracks of a large and of a small man in the road near the body.    Deceased was a large and the defendant an unusually small man.    This witness described the position of the body as it lay in the road and the nature of the three wounds, exactly as the witness Oliver did.    A small stick tooth brush, with either tobacco or snuff spittal adhering to it, protruded from the mouth of the deceased.    Witness saw a pocket knife with a three inch blade lying in the road about ten or fifteen feet distant from the dead body.    He also saw a finger ring picked up from the ground at a point nineteen feet distant from the dead body, in the direction of Oliver's house.    After remaining at the body but a few moments the witness started off to summon Justice of the Peace Fowler to hold an inquest, and on the way he met Mr. Oliver going to his, witness's, house, to get a wagon with which to haul some cotton for the defendant.    Witness still had the clothes worn by defendant when he came to witness in the field and reported the killing of the deceased.    The said clothes were here exhibited and identified by the witness, who pointed out knife cuts on each of the lapels of the coat.    One of those cuts showed to be larger on the inside than on the outside of the lapel, and the other showed to be larger on the outside.    The vest showed a small cut at about the third button from the bottom, and the pants a small cut just below the left pocket.    Defendant called the witness's attention to those cuts when he first told him of the killing.    Witness had known the defendant for many years, during which time he had maintained the reputation of a quiet, peaceable citizen.    So far as the witness was acquainted with the reputation of the deceased it was that of a quarrelsome but not a dangerous man.

Frank Waters was the next witness for the State, and the ruling of the court in this case turns upon the testimony affecting him as a credible witness.    Waters testified that, some time before the killing, while en route to Larkin Murphy's house to attend a party, he encountered the defendant on the road, and that on that occasion defendant told him that he was on his way to the party; that he was going expecting to find deceased at the party; that deceased had been telling lies on him, and that if he could get deceased off to himself he intended to kill him.    About that time deceased's brother rode up, and defendant said no more about the matter.    Witness did not tell of this threat until the meeting of the grand jury, when

he was advised that he had to tell everything he knew about violations of the law. He told defendant that he, defendant, was a fool for saying anything to the grand jury about the matter, which remark he made to defendant because defendant did not tell him the same story he told the grand jury. Witness's feelings for defendant were friendly until a few weeks before this trial, when he heard of the defendant's threats to impeach his testimony on this trial.

John Rhoden testified, for the State, that, on the Saturday previous to the homicide, the defendant, in a conversation with him, said that it was necessary for somebody to whip or kill Van Chambers, and that it had as well be him as anybody else; that he did not intend to molest deceased until he got him off to himself, when he would fix him. Witness had no recollection of telling defendant, in the presence of Alex Lowe and Mid Purvis, behind Fitze's billiard saloon, in Livingston, that he, defendant, had never made such statement to him, and that he, witness, had never stated to any body that he, defendant, had made such statement. Witness may have made the said denial to defendant and Lowe and Purvis, but did not remember it.

The remaining evidence for the State showed that each of the shots found upon the body of the deceased entered from the back; that the deceased was in his shirt sleeves when killed, or, at least, when the body was found, and that no knife or other weapon was found in the pockets or immediately on the body of the deceased.

Jeff Youngblood, the first witness for the defense, testified that late in January or early in February, 1887, at the house of old man Bailey, he heard deceased say that he was going to kill defendant; that he would certainly kill him if he could do so before defendant could draw a weapon to kill him.

E. Bailey corroborated Youngblood, adding that deceased made the statement immediately after procuring some cartridges from him. He said that he was "going to use those cartridges on Sam Griffin."

Jonathan Murphy and George Harrell testified, for the defense, that, at a party at Pace's, about three weeks before the killing of deceased, they heard the deceased say that he intended to kill the defendant.

J. L. Roberts testified, for the defense, that the deceased came to his house about ten o'clock on the night preceding the

killing, and remained until after breakfast on the next morning. At the breakfast table on that morning he told the witness that he went to defendant's house that evening, called him out, took him off about one hundred yards and cursed him and made him "knuckle down" to him. Gib Roberts, the son of the preceding witness, corroborated his father, and identified the knife and ring exhibited as articles he saw in the possession of the deceased on the night before the killing.

Mrs. Griffin, the wife of the defendant, testified, in his behalf, that on the evening before the homicide, the deceased came to her house and called the defendant out. He and defendant went off to a point about one hundred yards distant and had a conversation of some minutes duration. The witness was too remote from them to hear what they said.

James Fowler testified, for the defense, that, early on the morning of the fatal day, the deceased came to his house and asked witness if he had seen the defendant on that morning. Witness replied that he had not, when deceased asked him how much a man would he fined for going to another man's house and cursing him. Witness replied that such an offense would most probably involve a heavy fine. The knife and ring identified by Gib Roberts as the articles he saw in the possession of the deceased on the night before the killing, were the identical articles that were found on the scene of the killing. The body of the deceased was found on the main road, eight hundred and thirty-two steps distant from Oliver's house. An ordinary horse walks about four miles an hour.

Alexander Lowe and Mid Purvis testified, for the defense, that in November, 1887, the State's witness, John Rhoden, at a point behind Fitze's billiard hall, told the defendant in their presence that he had never stated to any person that he, defendant, had said to him, Rhoden, that he wanted to get deceased out to kill him, or words to that effect, and that in fact defendant had never made such statement to him; and that the only statement he, defendant, had ever made to him about the deceased was that he wanted no row with deceased, but if he should ever have a row with deceased he would only use his fists.

John Johnson testified for the defense as follows: "I know the general reputation of the State's witness, Frank Waters, for truth and veracity in the neighborhood in which he lives.

It is bad. From that reputation he is not entitled to be believed on oath. I am not on friendly terms with Waters." Fifteen witnesses for the defense corroborated the witness Johnson, testifying in substantially the same language, the majority declaring themselves unfriendly with Waters, and some of them adding that the defendant's reputation was that of a quiet, peaceable, law abiding citizen.

The defense closing, the State introduced sixteen witnesses in rebuttal, to sustain the reputation of the witness, Waters, for truth and veracity. Each of the said witnesses testified that they were acquainted with the reputation of Waters for truth and veracity, and that it was good and such as to entitle him to belief on oath; that his said reputation was good when he resided in the town of Livingston, but that they did not know his reputation in the Big Sandy neighborhood, where he now lives and had lived since he left Livingston, and that they had never heard his reputation discussed or impugned until this trial. The proceedings upon the examination of these witnesses appear in the bill of exceptions, which is set out in full in the opinion of this court.

*Crosson & Holshausen,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. This conviction is for murder in the second degree, with the punishment fixed at confinement in the penitentiary for five years.

The record contains the following bill of exceptions: "The State placed upon the stand Frank Waters, who testified that, a short while before the killing of Van Chambers, the defendant told him, as he, the defendant, was on his way to attend a party that night, that he was going to the party expecting to find the deceased, Van Chambers, there, and if he could get him, the said Chambers, out by himself he would kill him. The defendant thereupon introduced eighteen or twenty witnesses to impeach the said witness, Waters, by showing that the general reputation of the said Waters for truth and veracity in the neighborhood was bad, and, from that reputation, the said Waters was not entitled to be believed under oath.

"The State then introduced some ten or more witnesses to sustain the reputation of said Waters, among others Dave Bal-

low, Polk Snow, D. S. Chandler, T. J. Epperson, W. J. Wake-field and L. F. Gerlock, to whom the State asked this question: "'Do you know the witness Frank Waters?' They said: 'Yes.' Are you acquainted with his reputation for truth?' They said: 'Yes,' and that it was good. On cross examination, they were asked by defense: 'Did you ever hear his reputation for truth discussed?' They said: 'Never until yesterday.'

"The State then asked each of said witnesses: 'Have you ever heard the reputation of the said Waters for truth and veracity impeached or impugned before this?' To which the defendant, by counsel, objected, because the question was improper and not confined to the knowledge of said witnesses as to the general reputation of the said Waters in the neighborhood or community where he lives. The objection was overruled, and the defendant excepts to the ruling.

"The State then asked each of the following witnesses (naming seven), 'are you acquainted with the reputation of the witness Waters for truth and veracity?' which, being answered in the affirmative, they were further asked if it was good or bad; which, being answered 'good,' they were further asked if he, the said Waters, was entitled to be believed under oath; to each and all of which said questions the defendant excepted, because they were not proper in determining the general reputation of said witness in the neighborhood where he lives for truth and veracity, and was permitting the witnesses to testify, not as to the general reputation of Waters for truth and veracity, but as to their own opinion and belief; which objection was overruled by the court, and to which defendant excepted."

Two objections were made to the questions and answers:

I. That the witnesses did not state that they were acquainted with Waters's *general* reputation in the neighborhood in which he then lived.

II. That the witnesses were induced to, and did state their opinion as to whether he was entitled to credit, not from his general reputation for truth, but from their own knowledge or opinion of the witness.

This question is very elaborately discussed by Justice Bell in Boon v. Weathered, 23 Texas, 675. He states the rule to be "that the inquiry should practically be restricted to the general character of the impeached witness for truth * * * If the impeaching witness states that he is acquainted with the general reputation of the impeached witness for truth in the com-

munity where he lives, he may then properly be asked whether that general reputation is such as to entitle the witness to credit on oath. * * * Any other form of words may be used which do not involve a violation of the cardinal principles that the inquiry must be restricted to the general reputation of the impeached witness for truth in the community where he lives or is best known; and that the impeaching witness must speak from general reputation, and not from his own private opinion."

We are of the opinion that the questions propounded to the impeaching witnesses were not calculated to, nor did they, elicit the proper answers; that the questions and answers were violative of the cardinal principles governing this subject. First, the inquiry must be restricted to the general character of the party sought to be impeached; second, that the impeaching witnesses must speak from general reputation, and not from their private opinions, as to whether the character of the impeached witness is good or bad for truth; or as to whether the general reputation of the impeached witness is such as to entitle him to credit on oath.

There is no venue proved by direct or circumstantial evidence.

We call the attention of the learned trial judge to the fact that malice is not defined to the jury. As to the necessity of defining malice see Jones v. The State, 5 Texas Ct. App., 397; Toomey v. The State, Id., 163; Pharr v. The State, 7 Texas Ct. App., 339; Harris v. The State, 8 Texas Ct. App., 90; McKinney v. The State, Id., 353; Hayes v. The State, 14 Texas Ct. App., 330.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered October 13, 1888.