## ROWLAND v. STATE et al.

No. 12721.

Court of Civil Appeals of Texas. Fort Worth.

Oct. 22, 1932.

Rehearing Denied Dec. 3, 1932.

Marvin H. Brown & Son, of Fort Worth, for appellant.

134

H. C. Wade and J. M. Floyd, both of Fort Worth, for appellees.

LATTIMORE, J.

This is an appeal from a judgment suspending for six months Chas. T. Rowland, as an attorney at law, from the practice of law. The complaint was signed by seven practicing-attorneys. While article 314, Rev. Statutes, says "a practicing attorney * * * may file * * * a sworn complaint," etc., still there is no statutory prohibition against more than one such joining in the complaint. We are not able to believe that a jury who heard the testimony and were properly instructed as to the law would 'be so unmindful of their oath as to give any evidentiary weight to the fact that seven lawyers signed the complaint. No argument was made to the jury that these signatures added any probative value to the case, and the record is wholly silent of any fact suggesting that it did in fact influence the jury. The first assignment of error is overruled.

The affidavit of the attorneys who signed the complaint was that "each for himself deposes and says upon his oath that he has read the above and foregoing petition and complaint, and is cognizant of the statements and allegations therein contained; that he is informed that such allegations and statements in said complaint are true in substance and in fact." It is true that such affidavit would place a greater burden of proof upon one seeking to establish false swearing against the maker of such affidavit than if the affidavit had been an unqualified declaration of the truth of the facts pleaded in the complaint. It is likewise true that in the pleading of an ordinary civil case the statutes which require the same to be sworn to have been uniformly held not satisfied with an affidavit on information and belief. However, the matter has been passed on in Houtchens v. State (Tex. Civ. App.) 47 S.W. (2d) 679, on an affidavit in most respects similar to this and the complaint sustained. That case is now in the Supreme Court of this state on writ of error granted. The reasoning of Mr. Justice Levy is applicable to this jurat. In addition to those reasons, it seems to us that, when we apply the well-recognized rule of looking to the evil sought by the Legislature to be eliminated and the cure approved by that body, we can reach no other conclusion. Any other holding would practically destroy the remedy of disbarment. The Statute, article 314, limits those who may file disbarment proceedings to "the judge of any court, a practicing attorney, a county commissioner or justice of the peace." Evidently the Legislature had in mind the fact that the very nature of an attorney's business is such that he has enemies, those litigants who may have been on the opposite side of a lawsuit, people angered because the lawyer's advice was adverse to their desires, any of whom might from selfish motives or anger or disappointment be willing to lend themselves unworthily to humiliate the lawyer who had crossed their path. To avoid such event, the Legislature selected a class evidently believed to be free from such prejudice and a class whose daily life gave them access to abundant information with which to bear that responsibility thus placed on them. If that be true, then the very selection of the class makes the importance of a flat verification of the complaint dwindle.

But, if the complainant must swear unqualifiedly that the facts in the complaint are personally known by him to be true, and cannot be sworn to on information found to be reliable, and can only be filed by one of the above-named class, then the unscrupulous lawyer, the shyster, could prey with impunity upon the public, taking care to see that his misdeeds were not done in the presence or hearing of one of the above class. Such would destroy the beneficent value of the statute. We think the better view is that those who may by law file a complaint are named and charged with a sacred trust and duty to see that the unworthy, the unfaithful, are discharged from that great army whom the people have elected to lead them in an orderly and just management of their affairs with each other. As the shadow follows the substance, the law follows the development of society, and, as the law changes, the methods of the practitioner change. In no walk of life is so much trusted as to the lawyer. Money and property, titles, without receipt, confidences too sacred to disclose, mistakes too terrible to undo, reputation, honor, life, and liberty, all these rest in the hands of the chosen lawyer. In such a day the compliment paid the profession by the Legislature in selecting largely from the profession those who are charged with careful watch of the fraternity to see that none profane its sacred vows is not unappreciated, and the corollary is that their hands must be upheld. The second assignment of error is overruled.

We have examined the complaint, and have considered carefully each of the exceptions thereto. The various paragraphs of the complaint end with the charge that the facts therein constitute malpractice, fraudulent or dishonorable conduct. While each paragraph does not within its confines allege such a complete case, still, construed together, they do allege fully the various facts which were evidenced. Assignments of error 3 and 14, inclusive, are overruled.

Assignments of error 15 to 28 complain of various testimony of witnesses as to matters occurring out of the presence of defendant and with which he contends he was not shown to be connected. We review the state's case as presented: A Mrs. Johnson, who was

going under the name of Rolfe, had come with a friend, Helen Gibson, to Fort Worth from Oklahoma, and employed attorneys (not appellant) to file suit for her child for an interest in a large estate. A tentative agreement to settle this suit for $25,000 had been reached. Fred Strang, not an attorney, had gone to attorneys for the estate and arranged with them to assist them for $1,000 in making a settlement advantageous to the estate prior to the time the tentative agreement was reached, and had employed Rowland to advise him and promise him a portion of this $1,000 as his fee. Strang, after this $25,000 settlement appeared agreed to, procured Emma Rudd, a manicurist, to approach Mrs. Johnson and represent to her that she had overheard in a barber shop a conversation to the effect that the estate was actually paying $175,000 on this settlement, and that her lawyers were joining with the estate's lawyers to defraud her out of the difference, and that she (Mrs. Rudd) had a lawyer friend, Strang, who would do better by her. Mrs. Rudd carried out these instructions, and returned to Strang with Mrs. Johnson's invitation to Strang to call on her, Strang stating to Mrs. Rudd, "If this steal goes over, you get $5,000.00 out of it." Strang called on Mrs. Johnson, told her, in long detail not necessary here to repeat, that she was a victim of ignorant and unfaithful attorneys, and that he, Strang, and his partner, Rowland (the appellant), would get her more money, and requested her to discharge her attorneys and turn the representation of her rights over to Strang and appellant. He left, and Mrs. Rudd called later, and Mrs. Johnson told her to send her friend to see her, that she had decided to commit her case to his hands. Strang procured her signature to letters discharging her then attorneys, and took Mrs. Gibson away from the presence of Mrs. Johnson "to talk to her". This engagement lasted for two hours or more. Thereafter Strang moved the two to an apartment and paid the rent. Strang told Mrs. Gibson to keep Mrs. Johnson in the background, and he would transact his business with the latter through the former.

▇▇ The above is substantially the facts testified to up to the stage of the proceedings where the appellant is connected with it by testimony and to the admission of which appellant assigns error. In order that our discussion may be understood, it is necessary to review some of the state's testimony of what occurred later. These women went to Rowland's and Strang's joint office; Rowland was introduced to Mrs. Johnson by Strang as "her lawyer"; and Rowland and Strang had Mrs. Johnson assign to Mrs. Gibson all her settlement except $2,500, reciting a debt to Mrs. Gibson, who testified that Mrs. Johnson never at any time owed her any money. Mrs. Johnson told Rowland and Strang that she was married. Rowland exclaimed, "Why did you do that, now you can only get $2,500.00." The case was settled for $32,500. Appellant appeared in court at that time and declared himself to be of counsel, took the check from the clerk for Mrs. Johnson, signing as attorney, carried the check to his office, delivered it to Strang in Mrs. Johnson's presence, all of them went to the bank, and it was cashed without Mrs. Johnson, according to her story, being allowed to know the amount. Appellant was paid $1,000 of the check and left the bank, leaving Mrs. Johnson, Mrs. Gibson, and Strang. Thus it is seen that until the first meeting of Mrs. Johnson and appellant in the latter's office all of the transactions occurred out of appellant's presence, and there is no exact evidence as to the time that knowledge of these transactions was brought home to him. The circumstantial evidence is sufficient and the jury verdict conclusive on us that he knew of them prior to the time he appeared in court on the day before the settlement judgment. The testimony of Mrs. Johnson, the first witness for the state, directly implicated appellant in a fraud for which her testimony was sufficient to support a verdict. When a prima facie case has been made against a defendant of an unlawful conspiracy, the acts of the other conspirators in furtherance of the conspiracy, even though done before the defendant became connected with the conspiracy, are admissible. It does not lie in the mouth of the wrongdoer to say: "I took the benefits of their deeds and sought to and did carry on what they had already started, but I will not accept the responsibility for them." Schallert v. Boggs (Tex. Civ. App.) 204 S. W. 1061; Daggett v. Farmers' Nat. Bank (Tex. Civ. App.) 259 S. W. 198, 202; Perry v. State, 44 Tex. Civ. App. 55, 98 S. W. 411; Longworth v. Stevens (Tex. Civ. App.) 145 S. W. 257. The cases cited by appellant are those where an appeal is taken from the trial court's order refusing to admit the testimony of declarations of a coconspirator because a prima facie case of conspiracy had not been made out. Moore v. Robinson (Tex. Civ. App.) 75 S. W. 890; Martin Brown Co. v. Perrill, 77 Tex. 199, 13 S. W. 975, and the trial court was upheld. As said by the lamented Mr. Justice Buck in Daggett v. Farmers' Nat. Bank, supra: "The order of proof is * * * discretionary with the court * * * but there must be some tangible * * * evidence of conspiracy, or a promise of its production."

The case of Fort Worth Live-Stock Commission Co. v. Hitson (Tex. Civ. App.) 46 S. W. 915, only holds that the conspiracy must be shown "to have existed at the time" the declarations of the coconspirator were made, but does not attempt to say that it must be shown that the defendant was then one of the conspirators. The facts stated in the opinion are too brief for us to judge whether they

were analagous to the case at bar. Those assignments are overruled; also assignment 29, which bears on the same legal principles.

Assignments of error 30 to 35 relate to objections to questions as leading and answers as opinions. We have examined each, and believe them without merit.

Assignments of error 38, 39 and 40 complain of the refusal of the court to allow appellant's counsel to question on cross-examination Mrs. Johnson concerning her sexual purity before her marriage, and condemning in writing her child as a bastard, to obtain money, and counsel cite Ingersol v. McWillie, 9 Tex. Civ. App. 543, 30 S. W. 56. That was a case in which a woman sought to show herself to have been the common-law wife of deceased. Another woman witness testified to declarations by the deceased made in intimate surroundings which went to deny the claim of marriage. The court permitted her to be cross-examined as to her sexual relation with the deceased and her living with him in such intimacy. This was correct because it went "to discover the motives, inclinations and prejudices of the witness" toward the litigants. The Supreme Court declined to grant a writ of error, but in a short opinion refused to approve so much of the Court of Civil Appeals' opinion as suggested the evidence was admissible as bearing on general character or reputation. Ingersol v. McWillie, 87 Tex. 648, 30 S. W. 869. These cases were discussed in Missouri, K. & T. R. Co. of Texas v. Creason, 101 Tex. 335, 107 S. W. 527, in which the early rule was reaffirmed that attack on general credibility may not be by cross-examination as to isolated acts of misconduct not connected with the issues being litigated.

This extended discussion would not have been necessary except for the recent case of Kennedy v. International-Great Northern Ry. Co. (Tex. Com. App.) 1 S.W.(2d) 581, 582, in which Commissioner Nickels in discussing the admissibility of certified copies of convictions of witness for crime, as impeachment, and after stating that mere acusations of crime were not admissible, said:

"But charges whose truth have already been established *or are presently admitted* obviously have import and character wholly alien to mere accusations; e. g., admission of lewdness by a female witness is 'relevant,' within the rules, to her credibility. Ingersol v. McWillie 87 Tex. 648, 30 S. W. 869. The ruling just cited is mentioned, with apparent approval, in M., K. & T. Ry. Co. v. Creason."

It will be seen from our discussion above that the ruling of the Court of Civil Appeals in the McWillie Case was not approved by the Supreme Court, on the grounds suggested in the Kennedy Case, but, on the contrary, Chief Justice Brown called attention to the fact that Chief Justice Gaines, speaking for the Supreme Court in the Ingersol Case, expressly declined to place the affirmance of the case on the grounds of an attack on general credibility, and thought it of such importance as to do the unusual thing of writing an opinion on refusing application for a writ of error. The question under consideration in the Kennedy Case was whether prior judgment of conviction of theft was admissible on general credibility. The statement italicized was therefore dicta. The opinion was not adopted by the Supreme Court. We therefore are not inclined to read the same as any departure by our courts from the established rule in Boon v. Weathered's Adm'r, 23 Tex. 675.

█ Moreover, it will be observed that the questions ruled out by the court in the one instance asked for details of the witness' chastity, which in general terms she had already confessed, and, in the other, a general question whether she wanted to add anything to the allegations of a sworn pleading, a question manifestly too broad, and in a third instance whether she had at a particular time admitted her child was a bastard, to obtain money, a question which would carry the court far afield in a controversy as to the merits of the witness' decision on that matter—wholly unrelated to the lawsuit on trial. Those assignments are overruled.

█ We do not believe the question asked by Assistant District Attorney H. C. Wade on cross-examination of coconspirator Fred Strang that "nearly everything you ever did incriminated you, didn't it?" was of such a nature that it was not cured by the court's instruction to the jury not to consider it. Strang submitted himself to the witness stand voluntarily at the instance of defendant, who proved him then to be a guest of Uncle Sam at the government hostelry at Leavenworth, Kan., having been admitted there on a letter of recommendation from the United States Circuit Court of Appeals for mail fraud. The question was improper, but could not have made the jury have any more unfavorable opinion of Strang than his own confessions, at the instance of appellant, had created—or that were just. Likewise the final suggestion of the same counsel that he return to Leavenworth was no more than the jury already knew was his next peregrination.

The whole matter would be comic if it were not such a tragic demonstration of the shortsightedness of the policy of the law to allow a felon in the penitentiary to testify in a place where honor and truthfulness are the cornerstones upon which the entire edifice of trials is constructed. He testified fully in the hands of friendly counsel, and assumed the blame of the transaction in phrases carefully worded, but, when cross-examination is offered as to discrepancies in that story and pressed on him, he draws his head into the shell of his immunity from self-incrimination. That he is not susceptible to the dictates of honor, truthfulness, and the duty of every citizen to uphold the social structure, his con-

finement as a felon strongly suggests, and his conduct demonstrates; that the pains and penalties of contempt of court mean nothing to one who is already condemned for a fine and imprisonment that makes the maximum punishment for his refusal to testify nothing is equally evident. The law ought not to allow such a one to testify at all, and the permission of Mr. Wade for Strang to return to Leavenworth is only that which ought to be necessary. The law should make provision that such a person ought not to be allowed on the witness stand in such a sorry position as this record shows.

 The court instructed the jury that "malpractice is the intentional failure to perform a duty owed by an attorney to his client and may consist of an act, omission or concealment of an attorney with reference to matters in which he has accepted employment as an attorney." We believe the definition was subject to the objection that it allowed the defendant to be found guilty on negligence alone. He may not have known of the duty and yet have "intentionally failed" to do it; for instance, if on a trial he had intentionally not made an objection to a ruling against his client because he did not believe an objection good, it being proven later that he was wrong in his idea of the law, and thus shown to have "intentionally failed" to perform a duty. "The corrupt motive, or fraudulent intent, is of the very essence of the offence, and ought to have been found by the jury." Jackson v. State, 21 Tex. 668.

However, the court defined "fraudulent conduct" as: "Fraudulent conduct by an attorney is an act, omission or concealment done, made or affected as an attorney with a purpose, design or intent to carry out fraud or wrong."

And "dishonorable conduct" as: "Dishonorable conduct by an attorney at law is the doing intentionally of some act, or acts in the discharge of his professional duty, which an attorney at law endowed with the ordinary sense of honor would not have done or the intentional failure to do that which under the same circumstances such an attorney would have done."

And we believe those definitions to be substantially correct as applied to this case and not subject to the objections urged by appellant. The court submitted separately whether the appellant was guilty of each, and the jury found that he was. This court, as such, feels that each of these issues cover the case fully, and that the evidence is sufficient to sustain the judgment of the court, and that, taken even in the light most favorable to the appellant, the court's punishment fixed at suspension for six months could have been no less, with respectability, for guilt on any one of the three questions. All exceptions to the charge are overruled.

Several assignments are directed to argument of counsel. We have examined each, and find no merit in any of them. Counsel for the state made a statement to the jury, the summing up of which was that the purpose of disbarment proceedings is to keep the administration of justice clean. The argument was a true statement of the law, and, if not in the record, was harmless.

After defense had made "an impassioned plea" to the jury not to deprive the defendant of his license, by which he earned a living, counsel for the state told the jury that the penalty would be fixed by the court, who could, if he wished, only suspend defendant or disbar him as the court saw fit, and that the probable action of the court was none of the jury's business. This also was correct, and invited by defendant, and in nowise to be criticized.

The gravity of the nature of these proceedings has caused us to speak more at length than some of the complaints justify. We have examined each assignment of error. The judgment is affirmed.

DUNKLIN, J., disqualified, not sitting.