## YOUNG et al. v. BLAIN.   (No. 666.)

(Court of Civil Appeals of Texas. Beaumont. June 1, 1921. Rehearing Denied June 15, 1921.)

1. **Mortgages** ⬉32(1)—**Deed absolute on its face may be shown to be a mortgage.**

A deed absolute on its face may be shown by the intention of the parties to be security for a debt and in legal contemplation a mortgage.

2. **Mortgages** ⬉36—**Party asserting that deed absolute on its face is a mortgage has burden of proof.**

The party asserting that a deed absolute on its face was in fact a mortgage has the burden of so showing by preponderance of the evidence.

3. **Mortgages** ⬉32(2)—**For deed absolute on its face to be held a mortgage, it must have been so intended by the parties.**

For a deed absolute on its face to be a mortgage, it must have been so understood and intended by both of the parties at the time of its execution.

4. **Trial** ⬉143—**In case of disputed facts issue should be submitted to jury.**

In case of disputed facts, the issue should be submitted to the jury.

5. **Mortgages** ⬉39—**Evidence insufficient to carry to jury whether deed absolute on its face was a mortgage.**

Where defendant admitted the execution of a deed, not pleading non est factum or that it was secured by fraud, but asserting that it was in fact a mortgage, evidence *held* insufficient to carry that issue to the jury; defendant testifying that she never signed the deed.

6. **Witnesses** ⬉345(2)—**Witness cannot be impeached by inquiry as to particular crimes.**

A witness cannot be impeached by allowing the opposite party to inquire whether he had not been charged with various criminal offenses, for that is not a proper mode of an impeachment even on cross-examination.

Appeal from District Court, Jefferson County; E. A. McDowell, Judge.

Trespass to try title by W. R. Blain against Annie E. Young and others. From a judgment for plaintiff, defendants appeal. Affirmed.

Jno. M. Conley, of Beaumont, for appellants.

W. R. Blain, of Beaumont, for appellee.

O'QUINN, J. This is a suit in trespass to try title to a lot of land in the city of Beaumont, brought by appellee against appellants. Appellants answered by general demurrer, general denial, plea of not guilty, and specially that the lot was, at the time of the execution of the deed in question, part of the homestead of appellant Mrs. Annie E. Young (then Mrs. Annie Sawyer), and that the deed challenged was, in fact, a mortgage.

At the conclusion of the testimony, the court instructed the jury to return a verdict for the plaintiff, upon which judgment was rendered. Appellants filed motion for new trial, which being overruled, they have brought the case here for review.

[1, 2] Appellants' first assignment of error is as follows:

"The court erred to the prejudice of appellants in giving a peremptory instruction to the jury to find for the appellee, and in overruling and denying appellants' exception to the peremptory instruction given by the court to the jury to find a verdict for appellee, for the reason that there was ample and sufficient evidence produced in the trial of said cause rais-

ing the issue as to whether or not the deed executed by the appellant Annie E. Young and her husband, Walter Sawyer, and appellee, W. R. Blain, to C. W. Howth, said deed bearing date September 17, 1913, recorded in volume 137, p. 582, of the Deed Records of Jefferson county, Tex., was, in fact, a mortgage."

—which said assignment is submitted as a proposition. The evidence shows that appellant Annie E. Young was, prior to 1911, Annie E. Pipe, wife of E. W. Pipe; that after being divorced from E. W. Pipe, she married Walter Sawyer, and was his wife on September 17, 1913, when the deed in question was executed; that after the death of Walter Sawyer, she married John Blease; that after having been divorced from Blease, she married Walter Young, one of the appellants herein.

Appellee offered in evidence: (1) A deed from J. D. Bendette, Jr., to Mrs. E. W. Pipe to the land in question, dated July 20, 1907; (2) decree of court divorcing Annie E. Pipe from E. W. Pipe; (3) decree of court partitioning the community property of Annie E. Pipe and E. W. Pipe, giving to Annie E. Pipe the land in controversy; (4) deed from Annie E. Pipe to W. R. Blain (appellee), dated August 16, 1912, conveying, among other things, the lot in question; (5) deed from Annie Sawyer and her husband, Walter Sawyer, and W. R. Blain, to C. W. Howth, dated September 17, 1913, conveying the lot in controversy; and (6) deed from C. W. Howth to W. R. Blain, dated December 18, 1914, conveying said lot to appellee.

It also appears from the evidence that in the partition suit between Mrs. Annie Pipe and her divorced husband, E. W. Pipe, she agreed to pay him $300, and the judgment was so entered, and she did not have the money, and that in order to get same she executed a deed to W. R. Blain (appellee), of date August 16, 1912, conveying to him the three lots decreed to her in said partition suit, one of which was the lot here in question, the deed reciting a consideration of $750, $400 cash and one vendor's lien note for $350, payable one year after date. It is not questioned but that this conveyance was simulated, being merely for the purpose of negotiating the note to enable Mrs. Pipe to get the money with which to pay the $300 awarded to E. W. Pipe in said partition suit, and that when the note for the $350 was paid off by Mrs. Pipe, Blain reconveyed all of said property back to her except the lot involved here. It is also shown by the evidence that before said note was discharged by Mrs. Pipe, and before Blain reconveyed said property back to Mrs. Pipe, her then husband, Walter Sawyer, was indicted for felony theft, and that in negotiating relative to said charge with W. R. Blain, appellee, the apparent title to said lot then being in said Blain, she, Mrs. Sawyer, her husband, the said Walter Sawyer, defendant in

said felony theft case, and said W. R. Blain, executed a deed to C. W. Howth, to said lot in question, dated September 17, 1913. This is the deed that appellants, in their answer, specially assert was a mortgage, and which appellee contends was executed as an absolute conveyance of the lot for the purpose of paying the $200 fee charged to defend said Walter Sawyer in said felony case.

Appellant Annie E. Young, with reference to the deed referred to in appellants' answer as a mortgage, testified as follows:

"Q. Now, Mrs. Pipe, there is in evidence a deed introduced by plaintiff, a deed from you and Walter Sawyer and W. R. Blain to C. W. Howth, that deed being dated September 13, 1917, and reading as follows: 'That Annie Sawyer, joined by her husband, Walter Sawyer, and W. R. Blain, of the county of Jefferson, state of Texas, for and in consideration of the sum of $200 to us in hand paid by C. W. Howth, the receipt of which is hereby acknowledged, have granted, sold and conveyed, and by these presents to grant, sell and convey to the said C. W. Howth of the county of Jefferson, state of Texas, all that certain lot, tract or parcel of land,' etc. Now I will ask you if you ever received that $200 which is recited as having been paid by Mr. Howth? A. Mr. Howth will tell you that he never paid me a thing. Mr. Howth didn't pay me a nickel in God's world, and I will take a dying oath that I never received a dime from him. I can't explain to the court how come to execute that deed, because I never executed nothing but this bond for Sawyer. That is all that I ever signed is that one paper. I signed a bond for Sawyer, because he got into some trouble. He was my husband at that time. Mr. Sawyer told me to go and get Mr. Blain, when he was arrested. He was arrested as he was going to get on the car at the post office, and he said, 'Go to Mr. Blain,' and I went up to Mr. Blain's office and told him that he was arrested, and he said, 'Do you want me to defend him?' and I said, 'How much will you charge?' and he said '$20 to plead his case,' and I had $10 in my pocket and I went up to John Ryan in the money order department and I got another $10, and I paid him his fee, and I said, 'Ain't you going to give me a receipt?' and he said, 'You know I am all right.' I certainly paid him cash, and he knows it too. He knows it, too, that I gave him $20, and Mr. Howth will be a witness for that, too. I gave him the $20 and he was in jail about two days. That was on the 8th day of August, 1913, that he was arrested, and it was between that and the 12th day I paid him the money, and he got him out of jail. He said to me, 'Are you going to let him stay in jail?' and I said, 'I don't know nothing about it,' and he said, 'Why don't you get a bond?' and he said, 'I will go his bond if you will deed me a lot,' and I said, 'I don't want to deed any lot over to you,' and he said, 'You will get it back again,' and he got me to sign the bond. Of course, I couldn't read it myself, and I just took what they read to me. I wasn't able to read it myself. If the deed that they have introduced dated the 17th of September, 1913, from W. Sawyer et al. to C. W. Howth, is claimed by Mr. Blain to be a deed

that we executed to secure them on Mr. Sawyer's bond, I will state that I know nothing of that. They told me that it was a bond that I was signing, and that is all that I know."

On cross-examination she further testified:

"At the time myself and Mr. Blain made that deed to Mr. Howth, there was some improvements on the lot. * * * On September 3, 1914, Mr. Blain deeded this land back to me, but at the time he gave me that deed, I did not understand at that time that he wasn't going to deed it all back to me; that is, this 46 feet on the east end of that property. I didn't owe Mr. Blain a nickel, and I didn't receive a nickel from him, and this is nothing but a pure piece of robbery. Yes, sir, I told my attorney that he refused to deed it back to me. He told me that he wouldn't deed it all, that he was going to keep that lot. I didn't know that I was signing a deed to my property. I thought I was signing a bond. Of course, I didn't owe him anything, and I thought when I signed that paper that I would get it back if I signed it. This paper that you hand me has my signature on it. Yes, sir; that is my signature. And it appears to have been dated on the 17th of September, 1913. At the time I signed it with the intention of getting it back again. At the time this deed was made to Mr. Howth, I will say that I had nothing to do with it, and Mr. Howth will tell you the same thing. I will also state that when we made this deed to Mr. Howth, I did not tell Mr. Blain that I would pay him $200 to represent Walter Sawyer. In fact, I never promised him anything, not a five-cent piece. He said, 'I charge $20 to plead his case,' and I paid him the $20 cash before he took the case. That $20 I paid Mr. Blain was to represent Mr. Sawyer in the courts, not the justice court alone. He charged me $20, and I paid him for it. I suppose Mr. Blain went to the justice court and represented Mr. Sawyer in the examining trial. I don't know for sure whether the grand jury of Jefferson county indicted him after that or not for theft, but he told me (Blain) that I had to get some one to go his bond, and I said I didn't know who to get, and he said. 'You sign a lot over to me, and I will go his bond,' and he said, 'I will give it back to you.' I don't know whether Mr. Blain went before Justice Showers and represented my husband, Walter Sawyer, on his examining trial or not. I was present in court at that time, but I don't know whether it was Justice Showers or not. Yes, sir; it was before one of the justices of peace that the trial was had. I paid Mr. Blain $20 to represent Mr. Sawyer. I don't know what Mr. Blain would charge to represent a man for theft, but I do know he said he would represent Mr. Sawyer for $20, and I paid him, and that was enough, too. It is not a fact that after Sawyer was indicted on a felony theft charge that I made that deed to Mr. Howth, and promised to pay Mr. Blain $200 to represent him. Mr. Blain told me he would plead his case for $20, and I paid him. There was no trial that I know of. There was no evidence against him. He came out of that case. I don't know how much money Walter Sawyer was charged with having taken. I never heard the amount named. I think he was charged with taking $75 and a watch, but I don't know anything more about it. I don't know anything more about it than you do."

Appellee W. R. Blain testified:

"There has been certain deeds introduced in evidence concerning this property, one from the defendant to me, and one from me to the defendant, and one from myself and defendant and Walter Sawyer to C. W. Howth. I will now tell about how I first become connected with this matter, beginning at the first transaction that I had with reference to this land. On March 13, 1911, Mr. Howth filed suit for Mrs. Pipe. It was at that time against E. W. Pipe, and in the original petition she applied for a divorce, * * * I think possible he tried the case, I am not positive, but there was no dispute as to the community property in that suit. The only thing involved was the divorce. Subsequently, the suit was filed by me for a division of the community property. * * * There was a settlement made by which Mr. Pipe was to receive a 27½ foot on the north end of the tract and Mrs. Pipe to receive the house in which they lived and the balance of the property. There was a tract 237 feet and the other was 46 feet by 237, and another little piece that she acquired through the Beaumont Improvement Company. There was an agreed judgment between the parties, and a judgment entered in the case. She agreed to pay $300 to E. W. Pipe when the judgment was entered. * * * In the meantime she married Walter Sawyer, and he was arrested, I think the 10th of September, and put in jail on the 10th of September. I made his bond for appearance before the justice of peace for examining trial, and charged her $20 to represent him in the examining trial, and she paid me $10, and I think she borrowed the other $10 from somebody. I told her that I would accept $20 in the examining trial before Judge Showers, and I did it the next morning. He was bound over to the grand jury, and I made that bond. Mr. John Brooks and myself were sureties on this bond. That bond was made on the 11th day of September. The grand jury returned an indictment against him on the 13th day of September, 1913, and on the 17th she came to the office. He was arrested on the 17th of September, and she came to the office some time between 11 and 12 o'clock and told me that he had been arrested, and we had to make another bond for him, that he was in jail, and I told her that I wouldn't make the bond for him unless I was paid a fee in the case for representing him. I told her that if she wanted to employ Mr. Howth and myself to represent him in the felony case, that we would if the fee was paid. She didn't pay any money, and suggested that I take this title to the land in my name and that would be security. I told her that it would not be security, that it was her homestead, but that she could make a deed to Mr. Howth for the 46 feet, and in that way there would not be any question as to the passing of the title out of me. So she and I and Walter Sawyer executed the deed to Mr. Howth. That deed was executed for a $200 fee to represent Walter Sawyer in the felony case pending against him in the district court. It was not for the purpose of securing money on a bond for Walter Sawyer, none in the world. I had

signed his bond twice before without any security. That deed was given as a fee for representing him. * * * After this deed was made by myself, Walter Sawyer, and Annie Sawyer to Mr. Howth, Mr. Howth made a deed to me. Mr. Howth and I dissolved partnership in September, 1914, and at that time we owned this piece of land, and another piece in the A. B. Williams survey about half a mile north of this and an interest in a tract of land in the Bullock survey that we had taken in as fees and he deeded the three tracts to me. That was my part of the fees. That is I got the land in a settlement of our partnership business. That deed was made to me as a settlement of the affairs of our office."

### On cross-examination he further testified:

"When Mrs. Pipe first came to see me about this Sawyer matter, I don't think there was any complaint filed at that time. I think the complaint was filed afterwards. They had just arrested him, and she came on to the office to see me. When he was first arrested, he was not charged with a misdemeanor, but was charged with a felony for stealing 90-odd dollars and a watch. I don't know whether the bond says that he was charged with a misdemeanor in the justice court or not. In fact, I don't know what the bond says, but I know what I represented him for, and I know what he was charged with. * * * After he was indicted, he was arrested again on the 17th. This examining trial was had on the 11th. * * * I understood that he had been indicted, and was put in jail when she came to the office. * * * I did not appear before the court on the 16th and have his bond fixed for him. At that time I was not employed in the case. I represented the man in the justice trial for $20, which was paid, and knowing that if he was indicted I felt that he would come back to get me to represent him again, but I didn't consider that I was employed in the case at that time. I was out of the case and paid for it, when the examining trial was over. After he was indicted, she came to the office, and my agreement was to defend him for $200. * * * I have already stated several times the case was dismissed on the motion of the county attorney, and that the case did not go to trial. I convinced the county attorney that he couldn't convict him, and the case was dismissed on his own motion. I had several long conversations with Scurlock about the case. I came to court every time it came up for trial. I don't know how many times it come up for trial, but I know Mr. Sawyer, and myself were in attendance three times. I have a distinct recollection that it was set for trial more than the one time marked on the docket, and I was present every time. The case was filed in the Fifty-Eighth judicial district court of this county, and my agreement was that I would defend him, and my agreement was to get him out if I could for $200. It didn't matter whether I tried the case or not. I considered when the case was dismissed that I had fulfilled my agreement with her. That agreement contemplated that I would try his case, and I would have tried it if it had not been dismissed, but it did not contemplate that if he had been tried and convicted that I would appeal his case for him in the Court of Criminal Appeals. We did not have any understanding about that. My agreement went to the extent that I would defend him in the district court for $200, and he never had a trial in the district court. The surest and best way to get rid of a criminal case is to get it dismissed if you can."

The witness Jean A. Hartnett testified for plaintiff as follows:

"You have exhibited to me a paper which purports to bear my signature, and I have examined the same, and have identified same as my signature. Will also say that I took the acknowledgment as a notary public of this county to that instrument. I was present at the time Mrs. Young, at that time Mrs. Sawyer, and Mr. Blain had a conversation with reference to representing Mr. Sawyer, her husband. I was in the office with Mr. Blain and heard part of the conversation. The part that I heard was this: When Mrs. Sawyer came into the office this day, she had a bond. Her husband was in jail, and had been indicted—I believe he had been indicted, I am not sure. Anyway, she had a bond, and wanted Mr. Blain to represent him and get a bond up, and Mr. Blain refused to represent him unless she paid him a cash fee. She said that she did not have the money, and the question of land was brought up, some land she owned out there. I don't know exactly where it was at the time. When I came back to Mr. Blain's office, Mr. Blain had wrote up a deed, and I took her acknowledgment, wherein she transferred a lot to Mr. Blain for Mr. Blain to represent Sawyer, in that case for theft, I believe."

### On cross-examination he further testified:

"As I have already stated in my examination, I have a recollection about this woman having gone over to Mr. Blain's office, and talking over this whole transaction with him, but can't say that there is a distinct recollection. I remember the case and the occasion, and I remember what was said in that conversation; that is, part of what was said. She come in there and wanted Mr. Blain to represent Walter Sawyer, who was then charged with theft, and make bond, and get him out of jail. That was her purpose in coming up there, yes, sir; she said that was her purpose in coming up there, to get Mr. Blain to represent Walter Sawyer and make a bond for him. I also have a recollection about her saying that she wanted Mr. Blain to get him out of jail, as he was in jail at that time. Mr. Blain said that he wouldn't represent him unless she paid him a cash fee."

[3] That a deed, absolute on its face, may be shown by intention of the parties to be a security for debt or any financial risk, and therefore, in legal contemplation, a mortgage, is well settled. The deed in the instant case being absolute on its face—a regular warranty deed—and appellants having pleaded that it was a mortgage, the burden was upon them to show by a preponderance of the evidence that same was intended by the parties to be a mortgage. Brewster v. Davis, 56 Tex. 478; Lowry v. Carter, 46 Tex. Civ. App. 488, 102 S. W. 930; Goodbar v. Bloom, 43 Tex. Civ. App. 434, 96 S. W. 657.

(231 S. W.)

For the deed to have been a mortgage, it must have been so understood and intended by both parties at the time of its execution. Webb v. Burney, 70 Tex. 324, 7 S. W. 841.

[4, 5] Where there is any dispute as to the facts, then the court should submit the matter to the jury; but as we view the record, and under the law, the evidence submitted by appellants did not raise the issue of the deed being a mortgage. Appellants, in their pleading, admit the execution of the deed, but contend that same was intended as a mortgage. But Mrs. Young (Sawyer) nowhere in her testimony says that said deed was intended as a mortgage. In effect, she denies the excution of the deed, saying:

"I can't explain to the court how (I) come to execute that deed, because I never executed nothing but this bond for Sawyer, and that is all that I ever signed, is that one paper."

She further testified:

"If the deed that they have introduced, dated the 17th of September, 1913 (the deed in question), from W. Sawyer et al. to C. W. Howth, is claimed by Mr. Blain to be a deed that we executed to secure them on Mr. Sawyer's bond. I will state that I know nothing of that. They told me it was a bond that I was signing, and that is all that I know."

It thus appears that appellants' allegations in their answer that the deed was a mortgage is not supported by the proof, and being the only question to be determined, under the pleadings, there was no error in the court's instructing the verdict.

In their answer, appellants do not plead non cst factum, but plainly admit the execution of the deed, nor in the admission of its execution do they plead fraud in securing same. Therefore the testimony of appellant Annie E. Young that she "never executed nothing but the bond for Sawyer," and that "they told me it was a bond that I was signing, and that is all that I know," does not support the pleading that the deed was executed but was intended to be and was a mortgage. The assignment is overruled.

[6] Appellants' second, third, fourth, and fifth assignments of error complain that the court erred in not permitting them to ask the witness Jean A. Hartnett if he had not been charged with various criminal offenses, including murder, selling "dope," illegally making intoxicating liquor, and "bootlegging," contending that same was admissible to affect his credibility as a witness. The court did not err in sustaining objections to said questions. Judge Brown, in the case of M., K. & T. Ry. Co. v. Creason, 101 Tex. 336, 107 S. W. 527, says:

"At an early date in the history of this court, it was settled that 'in the impeachment of a witness the inquiry should be confined to his general reputation for truth, and that it should not extend to his general moral character.' Boone v. Weathered, 23 Texas, 675; Ayres v. Duprey, 27 Texas, 594; Kennedy v. Upshaw, 66 Texas, 452. In the case last cited Judge Stayton quoted the rule as above stated from Boone v. Weathered, and said: 'This is in accordance with the great weight of authority.' Boone v. Weathered has been followed by this court in all subsequent decisions, and has in no sense been modified in its application to impeachment of witnesses. However, it is claimed that the rule is not applicable to impeachment of a witness by cross-examination of him, and we are cited to a number of authorities to sustain that proposition, among which is Carroll v. State, 24 S. W. 100, in which the Court of Criminal Appeals depart from the rule established by the Supreme Court both for civil and criminal cases at the time that it had jurisdiction of criminal matters. In G., C. & S. F. Ry. Co. v. Johnson, 83 Texas, 633, this court distinctly applied the same rule to cross-examination of a witness for the purpose of impeachment that was laid down in the case of Boone v. Weathered. In the Johnson Case, a witness being on the stand, the party against whom he had testified, over the objection of the party who had called him, was permitted by the trial court, upon cross-examination, for the purpose of impeaching the witness, to ask him if he was not a deserter from the United States Army. Of which ruling this court said: 'The testimony was wholly irrelevant to any issue in the case. The object of it was to break down the witness' character before the jury and to discredit his testimony. A witness cannot be impeached in such way.' Thus we see that the rule applied by this court has been uniform that, for the purposes of impeachment either upon cross-examination of the witness attacked or by the introduction of other evidence, it must be confined to testimony relevant to the issue of the credibility of the witness. * * * We see no reason for departing from the well-established rule of this court upon the subject. We therefore answer that it was not competent on cross-examination to impeach the witness, Apple, by proving by him that he had been indicted for a felony or other crime."

These assignments are overruled.

No reversible error appearing in the record, the judgment is affirmed.